## GARDINER v. UNITED STATES.
### No. 2531.

Circuit Court of Appeals, First Circuit.

Feb. 19, 1931.

On Rehearing May 28, 1931.

Harris H. Gilman, of Boston, Mass. (Allan H. W. Higgins, of Boston, Mass., on the brief), for appellants.

J. Duke Smith, Sp. Asst. to U. S. Atty., of Boston, Mass. (Frederick H. Tarr, U. S. Atty., of Boston, Mass., on the brief), for the United States.

Before BINGHAM, ANDERSON, and WILSON, Circuit Judges.

ANDERSON, Circuit Judge.

This appeal raises the single question whether the Samuel Hammond Real Estate Trust is an association subject to taxes as a corporation for the five years ending June 30, 1926.

By stressing the facts that this trust succeeded to a testamentary trust, and that its actual business activities have been little more than those of the testamentary trustees, learned counsel for the appellant has made a fairly plausible argument that it should be classed with such concerns as the Wilson Syndicate Trust [Blair v. Wilson Syndicate Trust (C. C. A.) 39 F.(2d) 43] and the Costella Trust [White v. Hornblower (C. C. A.) 27 F.(2d) 777]. Both of these trusts were held organized for liquidation, not "for the purpose of doing business for profit."

But we think the court below [43 F.(2d) 450] was right in holding this trust an association conducting business for profit, and taxable as though a real corporation. Flint v. Stone & Tracy Co., 220 U. S. 107, 171, 31 S. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312.

While it originated under a decree of the probate court authorizing testamentary trustees to transfer real and personal property to themselves as trustees, and to issue therefor transferable shares to a large number of beneficiaries—instead of selling a property described in the petition to that court as "of considerable and increasing value"—exami-

nation of the terms of this trust instrument shows that its potentialities went far beyond liquidation. It was dated June 1, 1910, nearly seventeen years before this suit was brought. No step towards liquidation seems to have been taken in this fairly long period. Article 1 reads:

"This trust is formed for the purpose of purchasing certain property held by the Trustees under the will of Samuel Hammond, late of Boston, and of purchasing, improving, selling or holding any personal property and any other real estate in the city of Boston, in the Commonwealth of Massachusetts, or within twenty-five miles thereof, either in fee simple or for any less estate, or sole owners or as tenants in common with other owners, or as subscribers to other trust agreements for the purchase of any real estate included in the above description, or territory."

Under article 4, the trustees were given very broad business powers.

Articles 7 and 9 provide for the possible issue of $100 shares, additional to the 7,507 shares issued for the property initially taken over.

Article 11 originally gave three-fourths in value of the shareholders' powers to require the termination of the trust, to turn the property over to a new trust or to a corporation, to remove trustee, and to amend the trust deed. This was amended by a new article 13, on November 29, 1919, somewhat limiting the powers of the shareholders as to removal of trustees.

Article 12 contains careful provisions for meetings of shareholders at the calling of a trustee or at the request of shareholders owning not less than one-tenth in value of the shares.

With such broad powers of doing business, the facts that the trustees have made few changes in the original investments, and have leased most of their real estate so as to avoid furnishing janitor, elevator, and heating service, cannot distinguish this concern from the Hecht and Haymarket Trusts. Hecht v. Malley, 265 U. S. 144, 44 S. Ct. 462, 68 L. Ed. 949. See, also, United States v. Neal (C. C. A.) 28 F.(2d) 1022, certiorari denied, 278 U. S. 659, 49 S. Ct. 250, 73 L. Ed. 567; compare Crocker v. Malley, 249 U. S. 223, 39 S. Ct. 270, 63 L. Ed. 573, 2 A. L. R. 1601.

The judgment of the District Court is affirmed.

WILSON, Circuit Judge (dissenting).

For the present I must record my dissent to the opinion. If the original declaration of trust had been drawn substantially as it was left by the amendment of November 29, 1919, I should under the circumstances of its creation hold that it was not an association within the meaning of section 700(a) of the Revenue Act of 1924, 43 Stat. 253, 325 (26 USCA § 223 note), since the affairs of the trust would not then have been carried on in any manner similar to the mode of procedure of corporations, the shareholders having no control over the trustees. It would then have been a pure trust under the definition laid down in Williams v. Milton, 215 Mass. 1, 102 N. E. 355, which was adopted by Judge Holmes in Crocker v. Malley, 249 U. S. 223, 232–234, 39 S. Ct. 270, 63 L. Ed. 573, 2 A. L. R. 1601, as distinguishing pure or "exact" trusts from taxable associations. Also see Hecht v. Malley, 265 U. S. 144, 158–161, 44 S. Ct. 462, 68 L. Ed. 949; Burk-Waggoner Ass'n v. Hopkins, 269 U. S. 110, 113, 114, 46 S. Ct. 48, 70 L. Ed. 183. The substance of these decisions is that it was not the intent of Congress to tax pure trusts where the management of the trust estate was vested wholly in trustees, and for the ultimate purpose of more efficiently distributing the trust estate, but only those organizations, the beneficiaries and trustees of which were associated together, and the affairs of the trust conducted by trustees in substantially the same manner and mode of procedure as the directors of a corporation, and who were, in the final analysis, subject to the control of the shareholders.

As originally drawn, we agree that the Samuel Hammond Real Estate Trust was clearly subject to the excise tax under the Revenue Act of 1918 (40 Stat. 1057). By the amendment of 1919, however, the shareholders voluntarily surrendered up all their control over the trustees and the conduct of the affairs of the trust and its termination or amendment, except by withholding their assent in certain instances.

The opinion states that the amendment of 1919 somewhat limited the powers of the shareholders as to removal of the trustees. This hardly states the scope of the amendment. It provided: "The shareholders shall have no control over the acts of the Trustees, except in the matter of filling vacancies among the Trustees as provided in Sec. 11 hereof, and except the right of consenting to an alteration or amendment of this Agreement or termination of this Trust as above

provided, anything in this Agreement to the contrary notwithstanding, and any provision in this Agreement whereby the shareholders are given any control except as above stated is hereby annulled."

The amendment was probably made in view of the change in the Revenue Law by the Revenue Act of 1918, which rendered the original trust taxable. Whether the shareholders could by this amendment change the nature of the trust originally created, and thus escape the tax, is the real issue here. I have doubts, but I cannot assent to the opinion.

### On Rehearing.

ANDERSON, Circuit Judge.

On the appellants' granted petition for rehearing, the court heard further arguments and carefully reconsidered the case.

In the original brief opinion there is but a meager statement of the business powers of the trustees. We now somewhat amplify that statement.

The duration of the trust is for twenty years from June 1, 1910, after the death of the last survivor of the original trustees and of the then living descendants of said Samuel Hammond. Several beneficiaries having Hammond names are designated as minors. Their age is not given. It is enough now to note that the trust has a very considerable duration.

Under article 4 (referred to in the original opinion simply as giving the trustees broad business powers) they were authorized, generally, to invest and reinvest funds in their control; to execute and deliver all manner of deeds, agreements, and conveyances; to borrow money, not to exceed $200,000 at any one time; to appoint officers and agents for procuring subscriptions to the capital of the trust; to make conclusive decisions as to what charges should be made to capital and what to income; they are required to keep a register of the names and interests of the shareholders, and proper transfer books and books of account, which shall at all reasonable times be open to the inspection of any shareholder or his personal representative.

Article 4 was amended on February 20, 1920, so as to require the trustees to pay the entire net income to the shareholders. This savors of a pure trust. But the remaining powers are broad and, in their nature, quasi corporate. The trustees may buy shares from any shareholder, at any price, either canceling or reselling such shares. Distribution to the shareholders is referred to as "dividends." The trustees may "from time to time hire suitable officers for the transaction of the business of the trust."

Under article 7, there is provision for future subscriptions, to be paid in installments, and power to cancel subscriptions for nonpayment and accept another subscriber in place of the defaulter.

Under article 8 is a provision for the issuance of certificates of $100 each, and providing that, in case of loss or accidental destruction of a certificate, "the trustees may issue a new certificate on such terms as they may see fit"; and that the certificate "shall be conclusive evidence of ownership of the shares"; that the shareholder shall have no legal title to the trust property, and no right to call for any partition during the continuance of the trust.

Under article 9 is an express provision for receiving further subscriptions for the purpose of increasing the capital of the trust, giving preference, upon such terms and conditions as they shall deem best, to existing shareholders.

In article 10 there is provision that no assessments shall ever be made upon the shareholders.

Some other aspects of the granted powers are closely analogous to those of a corporation.

Article 12 provides for meetings of the shareholders, either called by the trustees or by five shareholders, or by shareholders owning not less than one-tenth in value of the shares.

It is true that, under the amendment of November 29, 1919, the powers of the shareholders at such meetings are pretty narrowly limited. But the right to meet and to consider the common interests of the shareholders remains unaffected by the amendment.

This amendment is as follows:

"13. The Trustees may at any time, by an instrument or instruments in writing assented to by three fourths in interest of the shareholders, and recorded in said Suffolk County Registry of Deeds, alter or amend this Agreement or terminate this Trust and sell the trust property and distribute the proceeds proportionally among the shareholders, or convey the trust property to new or other Trustees, under a new Declaration of Trust, or to a corporation. The shareholders shall have no control over the acts

of the Trustees, except in the matter of filling vacancies among the Trustees, as provided in Sec. 11 hereof, and except the right of consenting to an alteration or amendment of this Agreement of termination of this Trust as above provided, anything in this Agreement to the contrary notwithstanding, and any provision in this Agreement whereby the shareholders are given any control except as above stated is hereby annulled."

This gives the initiation of any proposition to amend or terminate this agreement to the trustees; it cuts off any possible power of the shareholders to exercise any control over "the acts of the trustees," except the right of consenting to an alteration of termination of the trust, and except (apparently) power to create a new trustee only "in case of the death or disability of both trustees." Otherwise stated, the effect of the amendment was mainly to increase the powers and permanency of the trustees.

In broad perspective, then, the instrument created an organization, with negligible powers in the shareholders to control the administration thereof, managed by two nearly permanent trustees.

Looking at the potentialities of the organization, the trustees might embark on very extensive business transactions. In fact, they have made almost no use of their broad powers. Does the existence of such unused powers, by practically permanent trustees, vested with almost absolute control over the property of the trust, make the concern an association within the meaning of the taxing acts? If the test is to be found in the actual use of the powers, the answer is "No." If the test is to be found in the existence of broad powers, the answer is "Yes." We find in the decisions of the Supreme Court no certain answer to this question. The chief cases are Crocker v. Malley, Collector, 249 U. S. 223, 39 S. Ct. 270, 63 L. Ed. 573, 2 A. L. R. 1601; Hecht v. Malley, Collector, 265 U. S. 144, 44 S. Ct. 462, 68 L. Ed. 949; Burk-Waggoner Oil Association v. Hopkins, Collector, 269 U. S. 110, 46 S. Ct. 48, 70 L. Ed. 183. None of these cases give us any clear guidance.

The history and nature of such associations was elaborately considered by this court in Malley v. Howard (C. C. A.) 281 F. 363, affirmed (except as to a minor question concerning the taxing act) in Hecht v. Malley, 265 U. S. 144, 44 S. Ct. 462, 68 L. Ed. 949. But we do not find in any opinion of other Courts of Appeals any entirely clear and decisive view on the crucial question in this case.

In Little Four Oil & Gas Co. v. Lewellyn, 35 F.(2d) 149, 150, 151 (C. C. A. 3d), Judge Woolley, after discussing some of the cases, said:

"The real test is whether the shareholders or trustees, or both combined, carry on business for profit, and, if they do, they constitute a business trust—in legal effect an association or a joint-stock company—with liability for taxes."

Again:

"As the character of the trust, whether or not a subject of federal taxation, is to be determined not by the broad powers of the trustees or by the limited powers of the stockholders *but by what the trust was actually doing through its trustees*, we hold on these facts that the Collectors were right in regarding this organization, however named, as an unincorporated association conducting a business for profit in *quasi* corporate form, liable for taxes at the corporation rate by force of the provisions of the applicable revenue act, and that the judgments of the District Court sustaining the Collectors must be affirmed." (Italics added.)

In Lucas, Commissioner, v. Extension Oil Co., 47 F.(2d) 65, 66 (C. C. A. 5th), the court affirmed the decision of the Board of Tax Appeals, 16 B. T. A. 1028. District Judge Hutcheson, after referring to many cases, said:

"Each of these cases grounds its result upon the controlling facts, and makes it clear that reality, and not fiction, must in each case determine whether the tax is or is not properly laid."

And, after referring to the opinion of the Board of Tax Appeals, Judge Hutcheson said:

"With this opinion we agree, for we think it plain that whether the matter be decided from the standpoint of an analysis and balancing of resemblances to corporate forms, *in the light of what use the petitioner made of them, as was done by the board, or whether, these resemblances aside, the matter is decided, not upon the basis of the powers potentially held by the petitioner, but of those actually used by it, upon what it did, rather than upon what it could do, a regard for the realities of the case before us permits no other decision."* (Italics supplied.)

The facts in that case were:

"That certain persons were the owners of an oil and gas lease which was about to lapse; that they deemed it good business policy to ascertain the value of the lease by drilling one well and if it was ascertained that oil existed, to forthwith sell the proven lease, otherwise to permit the lease to lapse by operation of time. For this purpose, money was needed and it was determined to raise the same by issuing 'units' which gave their owners an interest in the undertaking. It thus appears that the sole purpose of the trust was to raise money sufficient to drill one well, ascertain the possible value of the property and then sell it and distribute the proceeds. The purpose for which petitioner was organized was accomplished in the short taxable period before us. The things were done that were planned to be done. The money raised was placed in the hands of the trustees for a single purpose and not for the purpose of obtaining gain from a repetition of investments or business undertakings. As soon as money was received by the trustees, if even from the sale of assets, it was not retained or kept in a business but immediately distributed to the 'unit' holders."

The Board therefore held, in a decision affirmed by the Court of Appeals, that:

"The petitioner was not organized for the purpose of 'continued efforts in the pursuit of profit or gain and such activities as are essential to those purposes' (Von Baumbach v. Sargent Land Co., 242 U. S. 503, [37 S. Ct. 201, 61 L. Ed. 460]), but rather to advantageously dispose of property already owned by securing additional funds and thus to wind up a business undertaking. Gonzolus Creek Oil Co., 12 B. T. A. 310, and White v. Hornblower [C. C. A.] 27 F.(2d) 777. The fact that as a trust it engaged in the limited and restricted business necessary to accomplish such a purpose would not convert it from a trust into an association. Wilson Syndicate Trust [v. Commissioner], 14 B. T. A. 508."

The Board of Tax Appeals also says:

"A question which has troubled the Board is whether the absence of control of the trustees by the shareholders converts what would otherwise be an association into a trust. This question we decided in the negative in E. A. Landreth [v. Commissioner], supra [11 B. T. A. 1, 18], a proceeding which involved an entity which possessed every attribute of a corporation except, as was there contended, the power of the shareholders to control the trustees."

While none of these cases are, on their facts, exactly in point, the trend of expressed judicial opinion is that the crucial test must be found in what the trustees actually do, not in the mere existence of long unused broad powers. These two trustees have no business office; they hold no formal meetings; they merely consult with each other; they have hired no officers, employed no agents to procure subscriptions to the capital of their trust; they have sold one parcel of real estate and bought another, otherwise their real estate holdings are as originally; they have so arranged their leases as not to require them to run heating plants, or even provide janitor or elevator service. In sum their actual performance is indistinguishable from that of ordinary testamentary trustees.

The judgment below and the former decision of this court must be reversed.

The judgment of the District Court is reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion.