**TRUST NO. B. I. 35, BANK OF AMERICA NAT. TRUST & SAVINGS ASS'N v. UNITED STATES.**

No. 7799–RJ.

District Court, S. D. California, Central Division.

June 11, 1938.

M. F. Mitchell and George G. Witter, both of Los Angeles, Cal., for plaintiff.

Ben Harrison, U. S. Atty., E. H. Mitchell, Asst. U. S. Atty., Eugene Harpole, Sp. Atty., Bureau of Internal Revenue, and Francis C. Whelan and Armond Monroe Jewell, Asst. U. S. Attys., all of Los Angeles, Cal., for the United States.

JENNEY, District Judge.

This matter was tried before the court without a jury, evidence was introduced by both parties, stipulations of fact filed, and the case was submitted with the privilege, granted to both parties, of filing briefs.

This is a companion case to Jackson v. United States of America, 25 F.Supp. 613, published immediately following this opinion.

The Fox Oil Company, a California corporation, organized in 1909, acquired location rights on 160 acres of land in Kern County and proceeded to develop oil production; the first well being completed and put on production on January 26, 1910. Forty acres of this land were sold and the balance was leased under three leases: (1) The Van Slyke lease; (2) the Smith lease, and (3) the Fox lease. Leases (1) and (2) were for twenty years and under the terms thereof the lessee was to drill and produce oil in a more or less customary manner. The lessor, at its option, was to receive one-sixth of the oil production in kind or in proceeds from the sale thereof. Lease (3) was similar, except that it included certain tools and equipment and provided for a forty-five percent royalty on three preexisting wells and a one-fifth royalty on the balance; the lessee being required to drill only seven additional wells. This lease was made the subject of an oil sales contract with Standard Oil Company.

Certain other sales or marketing contracts were in existence which indicated that the Fox Oil Company was receiving its oil royalties in kind, pursuant to its option, and was selling its oil through a sales agency.

On October 20, 1920, Fox Oil Company executed a declaration of trust (Exhibit "6") with Bank of Italy, under the terms of which Fox Oil Company conveyed to the trustee the real property and all leases and contracts for production and marketing of oil then in existence; the title to the land having been previously acquired by the corporation. The trust instrument provided, briefly, as follows:

Article 1. Limited trustee's liability for title to trust property, etc.

Article 2. The trustee was given power to hold the property, oil leases and sales agreements, and in the event of lapsing or termination of any leases, to negotiate and execute new leases, with the consent of an Advisory Committee, consisting of three interested parties who were named in the agreement. In like manner the trustee was given power to negotiate new sales agreements and to receive the rents, royalties and profits from the trust estate. During the term and upon expiration of the trust, the trustee was authorized to make full and complete distribution of receipts.

The Advisory Committee, consisting of three former stockholders of the Fox Oil Company, was, by the terms of the trust instrument, created "for the purpose of aiding and advising said trustee in the care, management and control of said trust estate." Upon death or resignation of any member his successor was to be appointed by the holders of two-thirds in value of the beneficial interests.

The Advisory Committee was given the power to direct the trustee "to sell, lease, release, or enter into any agreement" which they deemed for the best interest of the beneficiaries and "to expend such sums of money" as they deemed necessary "for the care, maintenance and upkeep of said trust estate or for incidental expenses incurred in such care and upkeep". Monthly distribution to beneficiaries of the net assets was provided for and the trustee was given power, with the consent of the Advisory Committee "to make any sales, contracts or leases covering said trust property".

Article 3. From the gross income the trustee was to pay taxes, assessments, advances and other expenses incurred in the management and protection of the trust; an annual compensation to itself of $600 and reasonable compensation for extraordinary services.

Article 4. The issuance of 440,000 shares or units to beneficiaries was provided for and the persons originally entitled thereto were named. To these persons were issued, by the terms of the instrument, a certificate of beneficial interest, which was assignable by the beneficiary, upon acceptance by the trustee and consent thereto by the issuance of a new certificate of beneficial interest. Any beneficiary was authorized to deposit his certificate with the trustee, directing the trustee, "in the event of the death of the beneficiary", to issue a new certificate of beneficial interests to the person designated in the direction.

Article 5. Upon the written direction of the holders of two-thirds in value of the certificates of beneficial interest, the trust could be terminated and a new trustee appointed as therein provided.

An examination of the various sales agreements shows that they are of standard form in common use by oil producers, under the terms of which title to petroleum

products produced vests immediately in the sales agency.

Under the arrangement hereinbefore indicated the trustee performed certain acts, during the period in question, some of which should be noted and which may be briefly described as follows:

(1) The trustee collected the royalty proceeds from sales of oil, and, after payment of trustee's fees, taxes, etc., distributed, monthly, all, except a small balance, of the cash on hand.

(2) On January 18, 1924, the Advisory Committee borrowed $20,000 on the personal note of its members, from the Bank of Italy, pledging all of the assets of the trust to secure payment thereof. The proceeds of this borrowing were used by the trustee to pay unanticipated and unprovided for income taxes. The loan was liquidated by deduction from royalties at the rate of $1,000 per month.

(3) A sales contract with the Independent Oil Producers Agency expired with the year 1924 and another five year contract was executed by the trustee under the same terms and conditions as the previous contract.

(4) The Advisory Committee borrowed $10,000 on March 8, 1926, under like circumstances as indicated in No. 2 above.

(5) On August 11, 1926, the trustee, under the direction of the Advisory Committee, authorized transfers of one of the leases to the Jergen's Trust and accepted a quit claim deed from the old lessee.

(6) A new lease was then executed to Jergen's Trust under like conditions as the Van Slyke and Smith leases.

(7) On November 18, 1929, a new oil sales agreement was made with Independent Oil Producers Agency.

(8) The trustee, on July 18, 1932, executed a deed of right of way to Producers Transportation Company, which, according to the evidence, was the usual practice to accommodate neighbors.

(9) The sales agreement of 1929 was extended by the trustee, as of the end of 1934, for three years, to the end of 1937.

(10) In 1937 the trustee executed a right of way to General Petroleum Company, likewise a neighbor.

(11) Permission was given to a Lessee to drill other wells on the property covered by the lease pursuant to authority of the Advisory Committee, dated January 21, 1938.

(12) The trustee gave another Lessee the right to drill additional wells by a letter dated January 21, 1938.

The evidence shows that the land covered by the leases involved in this case was waste land and was valueless except for oil purposes. The trust owned no tools or drilling equipment or other personal property except possibly a small amount, which was leased to one of the tenants and would presumably be consumed during the period of the lease. The evidence showed that distribution of practically all of the income was made by the trustee monthly, and that, at the end of any year here involved, there was never more than $100 remaining in the hands of the trustee, undistributed. The evidence also showed that no person received compensation for services except the trustee, and no monies were paid out to reimburse any person for any expense incurred.

The main questions here involved are these: Should plaintiff be taxed as an association or as a trust for the calendar years 1931, 1932 and 1933, under the federal revenue acts in effect during those respective years? Were distributions made to the so-called beneficiaries of the trust between June 16, 1933, and December 31, 1933, distributions of corporate dividends properly subject to the excise tax of the N.I.R.A.?

As to the first question: Some of the cases hold that only activities occurring within the taxable years involved in the suit should be considered in determining whether the trust is an association and therefore taxable as a corporation rather than as a mere trust. The best considered cases seem to hold that representative activities outside the period involved in the suit should be considered by the court. Commissioner v. Vandegrift Realty & Investment Co., 9 Cir., 82 F.2d 387; Sloan v. Commissioner, 9 Cir., 63 F.2d 666; Argonaut Consolidated Mining Co. v. Anderson, D.C., 42 F.2d 219.

The government relies in a large measure upon the following cases: Morrissey v. Commissioner, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263, Swanson v. Commissioner, 296 U.S. 362, 56 S.Ct. 283, 80 L.Fd. 273; Helvering v. Combs, 296 U.S. 365, 56 S.Ct. 287, 80 L.Ed. 275; Helvering v.

Coleman-Gilbert Associates, 296 U.S. 369, 56 S.Ct. 285, 80 L.Ed. 278; Commissioner v. Vandegrift Realty & Inv. Co., supra; Sloan v. Commissioner, supra; Commissioner v. Atherton, 9 Cir., 50 F.2d 740; Argonaut Consolidated Mining Co. v. Anderson, supra; Crocker v. Malley, 249 U.S. 223, 39 S.Ct. 270, 63 L.Ed. 573, 2 A.L.R. 1601; Hecht v. Malley, 265 U.S. 144, 44 S. Ct. 462, 68 L.Ed. 949; Olympic Refining Co. v. Commissioner, 32 B.T.A. 1056.

Defendant relies upon the same cases and Ittleson v. Anderson, 2 Cir., 67 F.2d 323, 13 A.F.T.R. 314; Lansdowne Realty Trust v. Commissioner, 1 Cir., 50 F.2d 56; Julius Blum, Trustee, v. Commissioner, 25 B.T.A. 119.

The Supreme Court of the United States, in Morrissey v. Commissioner, supra, was dealing with an operating trust. In discussing what is meant by an association, the court said [page 295]: " 'Association' implies associates. It implies the entering into a joint enterprise, and, as the applicable regulation imports, an enterprise for the transaction of business. This is not the characteristic of an ordinary trust—whether created by will, deed, or declaration—by which particular property is conveyed to a trustee or is to be held by the settlor, on specified trusts, for the benefit of named or described persons. Such beneficiaries do not ordinarily, and as mere cestuis que trusts, plan a common effort or enter into a combination for the conduct of a business enterprise. Undoubtedly the terms of an association may make the taking or acquiring of shares or interests sufficient to constitute participation, and may leave the management, or even control of the enterprise, to designated persons. But the nature and purpose of the co-operative undertaking will differentiate it from an ordinary trust. In what are called 'business trusts' the object is not to hold and conserve particular property, with incidental powers, as in the traditional type of trusts, but to provide a medium for the conduct of a business and sharing its gains." And again at page 358, 56 S.Ct. at page 295: "While the faculty of transferring the interests of members without affecting the continuity of the enterprise may be deemed to be characteristic, the test of an association is not to be found in the mere formal evidence of interests or in a particular method of transfer." The court then indicated the salient features of a trust created and maintained for carrying on a business enterprise and dividing any gains accruing from the common undertaking.

In Helvering v. Coleman-Gilbert Associates, supra, the Supreme Court had before it a case where co-owners of about twenty apartment houses in Boston conveyed the properties to trustees who thereafter managed and operated the apartment houses occupied by some 1500 tenants. The Board of Tax Appeals had held that the trustees, although they did not exercise all of the powers given to them in the trust instrument, were nevertheless engaged in carrying on a business for profit; and the Supreme Court in its decision upheld the Board of Tax Appeals.

In Helvering v. Combs, supra, the trust was created to finance and drill an oil well and the well was actually drilled with monies contributed by beneficiaries. The court held that the parties were joined together in a common enterprise for the transaction of business and that the essential features of the enterprise were not affected by the fact that the parties confined their operation to one oil well. It was apparent that the objective of the organization was the creation of income; the court there referred, among others, to the case of Swanson v. Commissioner, supra, where two individuals acquired a piece of vacant land and erected thereon an apartment house which was conveyed to trustees; the trust instrument provided complete power in the trustees to manage, control, supervise, and operate the apartment house. Mr. Justice Hughes held that the limited number of actual beneficiaries did not alter the nature and purpose of the common undertaking. Nor did the fact that the operations of the association did not extend beyond the real property first acquired change the quality of the undertaking. In this case the enterprise was clearly entered into for the creation of income which was not, of course, in any way assured.

The Circuit Court of Appeals for the Ninth Circuit in the case of Commissioner v. Vandegrift Realty & Inv. Co., supra, has carefully considered "the distinction between an association and a trust" and has discussed a number of cases previously decided. Our Circuit Court of Appeals there stated that three tests have been found in the regulations to aid in arriving at a determination as to whether an or-

ganization is an association or a trust, namely: (a) purpose, (b) actual operation, (c) form of organization. The Court said: "We recognize that the question as to whether or not the trust engaged in business during a specified period is one of fact, but we hold that it is a question of law as to the activity required in order that a trust be classified for tax purposes, either as an association or a simple, inactive, or pure trust, and we hold that it is a question of law, with respect to the measure or standard by which we may determine whether or not a trust shall be taxed as a corporation, by reason of its classification as an association." 82 F.2d 390.

The Court said also that the purpose for which a trust was organized must be given weight and that in determining the question the court should look to the statement of purposes in the instrument of creation rather than to the statement of the parties with respect thereto. The Court said: "There can hardly be a serious question as to the fact that the trust was carried on under a corporate form, but the Supreme Court indicates very clearly in Morrissey v. Commissioner, supra, that little consideration should be given to the form of organization under which the trust is operated, but rather that the true rule is that purpose and actual operation of the trust should be controlling in determining whether or not the trust shall be classified as an association for tax purposes."

Nothing in the Vandegrift Case, so carefully considered by the Circuit Court of Appeals for the Ninth Circuit, eliminates the determinative element of carrying on a business enterprise for gain. It seems to this court that the Circuit Court of Appeals particularly wished to call attention to the fact that there should be added to the well-recognized tests the element of purpose of organization and that the form of the organization should be minimized.

Furthermore, the Vandegrift Case recognized the distinction applied in favor of liquidating trusts organized purely for the purposes of liquidation, and referred to Blair v. Wilson Syndicate Trust, 5 Cir., 39 F.2d 43. The latter case dealt with a taxpayer, which, like the trust at bar, was not organized for the purpose of doing business for profit nor for doing business at all. Its purpose was to liquidate and distribute an estate. The Circuit Court of Appeals for the Fifth Circuit, in holding that the trust in question was not taxable, said [page 45]: " * * * If a corporation is doing that for which it was organized, for the purpose of earning profit, very slight activity is sufficient to constitute the doing of business. Flint v. Stone Tracy Co., 220 U.S. 107, 31 S.Ct. 342, 55 L.Ed. 389, Ann.Cas.1912B, 1312. On the other hand, if a corporation is not organized for profit, but merely to hold real estate for ultimate disposal and liquidation, it is not doing business, although it incidentally collects the rents and distributes them. Zonne v. Minneapolis Syndicate, 220 U.S. 187, 31 S.Ct. 361, 55 L.Ed. 428; United States v. Emery, etc., Co., 237 U.S. 28, 35 S.Ct. 499, 59 L.Ed. 825."

The principal purpose of organization, as indicated by the trust agreement, in the case at bar, is the collection and distribution of income by the trustee to the beneficiaries. As is usual and customary in a trust with a substantial res, certain actions are permitted and even required by the trust instrument in preserving the res. The acts previously indicated as having been authorized by the instrument and the things actually done by the trustee, according to the evidence, do not represent any new undertaking or any effort to create new income. They are merely acts necessary to maintain the status quo as it existed at the time of the creation of the trust. As stated in Ittleson v. Anderson, supra, 67 F.2d 326: "When * * * a trustee is merely engaged in the amount of business activity necessary to preserve the corpus and otherwise discharge the functions traditionally attributable to a strict trust, it is not treated as an association." Lansdowne Realty Trust v. Commissioner, supra, and Gardiner v. U. S., 1 Cir., 49 F.2d 992.

The rule laid down by the authors in Paul & Merten's "Law of Federal Income Taxation" in Volume 4, Paragraph 35.26, follows well considered cases: "It has been indicated that there are two essential conditions to taxability as an association: (1) an organization must be engaged in business for profit, and (2) it must take a quasi-corporate form. Neither element, standing alone, is sufficient to justify the taxing of an organization as an association. * * * Although the existence of both form and activity is necessary, the weight of authority regards the business

activity of the trustee or other persons as the factor having the greater significance." Paul & Merten's Law of Federal Income Taxation, Vol. IV, Par. 35.26.

In each of the cases particularly relied upon by the Government, the object and function of the trust seems to have been the creation of income through the enterprise and activities of the trustees. In the instant case all of the lands turned into the trust were under long term leases with complete operations in the hands of the lessees who had been operating them for several years prior to the creation of the trust. All of the activities contemplated by the trust were confined to the trust res itself. There was no authority to buy any additional properties or to engage in any activity other than to renew leases on portions of the res, or make substitute leases, or renew or substitute marketing contracts, or to convert incomes into cash. The trustee was limited by the very terms of the instrument in its expenditures to "such sums of money out of the funds in its hands as such committee (referring to the Advisory Committee) may deem necessary for the care, maintenance and upkeep of the trust estate, or for incidental expenses incurred in such care and upkeep." The powers indicated in the trust instrument and in the activities acknowledged by the trustee to make a renewal or substitute lease or sales agreements are nothing more than the traditional and incidental powers which a trustee of a strict trust has exercised from time immemorial in order to preserve the res in a contingency. In this case the land had no practical value. The trust res consisted of the petroleum products taken out of the land. These petroleum products were, of course, being gradually exhausted. In that sense the trust was a constantly liquidating one.

We do not believe, that Congress intended by its legislation, nor that the Supreme Court of the United States or the Circuit Court of Appeals for the Ninth Circuit intended by their decisions, to do away with trusts of the type before us, by imposing thereon the type of taxation which has come to be generally accepted as properly applicable only to business enterprises for profit.

Under the circumstances, it is therefore our considered opinion that plaintiff should be taxed as a trust and not as an association. The Statute of Limitations having run, as to much of the recovery prayed for in the original complaint, judgment is accordingly rendered on the first cause of action, in the amount of $1,979.69, together with interest thereon according to law; on the second cause of action, for the sum of $319.59, together with interest as provided by law; on the third cause of action, the sum of $1,363.58, together with interest as provided by law; on the fourth cause of action, the sum of $345.51, together with interest as provided by law. We hold that the distributions made to the so-called beneficiaries of the trust between June 16, 1933 and December 31, 1933, are not such distributions of corporation dividends as are subject to the excise tax of the N.I.R.A.

It is so ordered.