### WELLSTON HILLS SYNDICATE FUND et al. v. COMMISSIONER OF INTERNAL REVENUE.

No. 11162.

Circuit Court of Appeals, Eighth Circuit.

Feb. 24, 1939.

Rehearing Denied March 10, 1939.

George M. Rassieur, of St. Louis, Mo. (Theodore Rassieur, of St. Louis, Mo., on the brief), for petitioners.

Arthur A. Armstrong, Sp. Asst. to Atty. Gen. (James W. Morris, Asst. Atty. Gen., and Sewall Key, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before STONE, WOODROUGH, and VAN VALKENBURGH, Circuit Judges.

STONE, Circuit Judge.

This is a petition to review a decision of the Board of Tax Appeals determining income tax deficiency against petitioner for the year 1932. The controlling issue is whether petitioner was an "association" within the meaning of Section 1111(a) (2) of the Revenue Act of 1932, 26 U.S.C.A. § 1696(3), reading "The term 'corporation' includes associations, joint-stock companies, and insurance companies" and, as such, taxable as a corporation. Respondent claims here that petitioner is either an "association" or a business trust, which (he claims) is equivalent to an "association". Petitioner contends it is neither. The Board determined petitioner was not a trust but was an "association", under the statute.

"Association", as used in the Revenue Acts, is a general term requiring definition. The Supreme Court, this Court and other Courts of Appeals have attempted such definition in so far as necessary to dispose of the particular situation presented in each case. These definitions have taken the form of statement of certain characteristics which distinguish "associations" as used in

these Acts, and of examination of the indicia of such characteristics in the particular case.

■ The most useful discussion of the subject is contained in a group of four cases decided together, of which Morrissey v. Commissioner, 296 U.S. 344, 356–361, 56 S. Ct. 289, 80 L.Ed. 263, is the main case. In that case (pages 356–360, 56 S.Ct. 289) characteristics of an "association" (as used in the statute) are that it is made up of persons associating together in a joint enterprise for the transaction of business under terms which give to the arrangement a resemblance to corporate organization in that it comprehends some of the salient features of corporate organization, such as centralized management, continuity of interests, transferability of interests and limitation of liability. [1]

With the above statement of the rule of law to be applied, we turn to the facts, which are as follows. C. C. Willmore was engaged in the business of real estate and land development. He owned all of the stock ($50,000 capital) of the Cyrus Crane Willmore Organization, Incorporated. The company was organized to conduct a general real estate business, including acquirement, holding, improvement and disposition of real estate and to execute, acquire, hold and dispose of notes, bonds and mortgages. This corporation was the agency through which Willmore operated.

■ In order to acquire, improve and dispose of a certain tract of suburban real estate, Willmore conceived a plan by which he might enlist needed capital. August 17, 1928, the Wellston Hills Realty Company was organized—the above corporation (Cyrus Crane Willmore Organization, Inc.) owning all of its $5,000 capital stock. On September 11 and 13, 1928, the tract of land was bought and turned over to the Realty Company. September 15, 1928, the Wellston Hills Syndicate Fund was established by an agreement between the Realty Company, party of the first part and "the subscribers hereto collectively (hereinafter called 'Syndicate Subscribers'), second parties."

That agreement set forth that:

"Whereas, the Company, is the owner of a tract of land in the County of St. Louis, Missouri, to be hereafter known as 'Wellston Hills', being the property acquired by the Company from H. G. Schaefer and Zion Cemetery, the price paid therefore being $127,500.00 of which amount $42,500.00 was paid in cash at the date of the purchase, and the balance, $85,000.00 is secured by purchase money deed of trust recorded in the Recorder of Deeds' Office, St. Louis County, Missouri, said tract containing approximately 48 acres; and,

"Whereas, the Company requires financial aid to enable it to pay for the said property and to develop and improve the same with streets, alleys, sidewalks, gutters, sewers, water, electric light, gas, etc., and to properly market the said property; and,

"Whereas, Syndicate Subscribers have agreed to furnish such aid upon the terms and conditions hereinafter stated."

To accomplish the purposes set forth, the company was to contribute $5,000 and all of the subscribers (each for the amount individually set forth) $95,000 "making a total fund of $100,000 to be called the Wellston Hills Syndicate Fund." This fund was to be "used by the Company", on its checks as "Syndicate Manager", only for the following purposes:

"(a) to repay to the Company the $42,518.00 heretofore by it paid on account of the purchase price, plus interest thereon at 6% per annum;

"(b) to pay interest accruing on the said $85,000.00 Deed of Trust; also to pay the partial releases as provided in said Deed of Trust;

"(c) to pay interest accruing on such additional moneys as the Company may be compelled to borrow to pay for improvements on the said tract, and to pay installments of principal as the same become due upon such loans;

"(d) to pay taxes accruing against said property; and

"(e) to pay the engineering fees for platting said property, to pay for the improvements to be made thereon, including streets, sidewalks, gutters, sewers, water, electric light, gas, etc., and the engineering fees thereon, certificates of title, auditors' fees, legal fees, etc."

---

[1] In A. A. Lewis & Co. v. Commissioner, 301 U.S. 385, 388, 57 S.Ct. 799, 801, 81 L.Ed. 1174, in commenting on the Morrissey case, the Court said: "We pointed out that the corporate analogy was evidenced by centralized control, continuity and limited liability, as well as by the issue of transferable certificates; and we said (296 U.S. 344, at page 356, 56 S.Ct. 289, 295, 80 L.Ed. 263) that the word 'association' implies associates."

The Company was designated as "Syndicate Manager" with sole right to determine when and what improvements be made and the prices and terms at which lots be sold.

The fund was not usable by the Company until payments therein of the entire $100,000 and the agreement was void and refund by the Company required unless the entire amount was paid in by September 30, 1928.

There were provisions as follows:

"The Syndicate Subscribers shall not be regarded as partners of each other or of the Company. The Syndicate Subscribers are advancing the amount subscribed by them respectively solely to aid the Company, to enable it to finance the project, but the amounts paid in by subscribers shall not be regarded as a loan for which the Company assumes personal responsibility and said amounts are not to be repaid to the subscribers except as hereinafter stated. * * *

"3. All amounts received from the sale of lots, the cash payments as well as deferred payments, shall also be deposited to the credit of said Wellston Hills Syndicate Fund.

"4. Said Wellston Hills Syndicate Fund shall be used and applied as follows:

"(a) The first 25% of the sale price of each lot shall be paid to the Company out of the first cash received on account of the sale of such lot, which amount is to be paid to the Company to cover salesman's commissions and other expense of selling, advertising, postage, collecting the deferred payments, keeping the accounts of the Syndicate and all clerical work and overhead expense of every description, including compensation to the Company for managing the same.

"(b) Next, out of said Syndicate Fund the Company shall pay to the Syndicate Subscribers on account of their interest therein, a sum equal to 6% per annum of the subscription amounts which sum shall be payable in annual, semi-annual, quarterly or monthly installments as the Company may deem best.

"(c) Next, out of said Syndicate Fund the Company shall pay all amounts which are to be paid out to fully pay for the property, improvements, taxes, interest, etc., as provided in paragraph 1, hereof.

"If the Company is compelled in any year to pay income taxes based on profits arising from the sale of Wellston Hills lots, notwithstanding the fact that such profits are to be paid by it to the Syndicate, then the taxes so assessed shall be refunded to it out of the Syndicate Fund the same as taxes against the property, that is to say, the Syndicate Fund shall in that event bear that pro-rata part of the Company's income taxes for such year as the profit resulting from sales of Wellston Hills lots bears to the total gross income of the Company for such year.

"(d) Distributions of Syndicate Funds shall be made to the Syndicate Subscribers whenever in the opinion of the Company funds of the Syndicate are available for said purpose, but only after sufficient funds have been set aside to guarantee the payment of all amounts when due which may then or thereafter be required to pay for improvements, taxes, interest, etc., as required under paragraph 1 hereof, and when all lots have been disposed of and all liabilities have been paid and all outstandings have been collected or disposed of, final distribution shall be made to the Syndicate Subscribers. Each Syndicate Subscriber shall be entitled to that pro rata part of the Syndicate's funds and profits which his subscription bears to the amount subscribed by all the Syndicate Subscribers. In order to wind up the Syndicate earlier the Company is authorized to discount and sell outstandings belonging to the Syndicate.

"If the Syndicate is not wholly wound up on or before December 31, 1938, then any Syndicate Subscriber may demand that the Company forthwith wind up the Syndicate, dispose of its remaining assets and make distribution thereof to the Syndicate Subscribers.

"5. It is the understanding of the parties that no profits are to be retained by the Company out of said project except—

"(a) such profits as it may receive as a Syndicate member; and

"(b) such profit as it may be able to make out of the first 25% of sales which it is to receive as provided in paragraph 4 hereof.

"Less, if any, up to the amount paid in by Syndicate Subscribers shall be paid out of the Syndicate Fund, but the Company guarantees Syndicate Subscribers against any loss in excess of their subscriptions and losses, if any, in excess of the amount paid in by Syndicate Subscribers are to be paid solely by the Company."

The separate interests of subscribers were made transferable through means of "certificates or receipts" issued by the Company—form of certificate and assignment thereof is set out as follows:

"6. The Company shall issue transferable certificates or receipts in form substantially as follows:

"No......  Amount $......
  "Wellston Hills Syndicate Certificate
    "St. Louis, ......, 192...

"We hereby certify that ...... (or his assignor) has subscribed and duly paid ...... Dollars into the Syndicate known as Wellston Hills Syndicate, formed to enable this Company to purchase, develop, improve and sell the property to be known as Wellston Hills Subdivision, as provided in the agreement entered into between this Company and the original Syndicate Subscribers, bearing date September 15th, 1928. The Syndicate Fund originally subscribed is $100,000.00, but the Company reserves the right to accept additional subscriptions whenever the Company finds it necessary to do so. The registered holder hereof is entitled to participate pro rata with other Syndicate Subscribers in the distribution and profits of the Syndicate, upon presentation of this certificate to the Company for endorsement of such payment thereon. Distributions, not exceeding 6% per annum, may be made hereon to the registered holder hereof when and as may be determined by the Company, without requiring the endorsement of such payments hereon. The rights hereunder are transferable only upon surrender to the Company of this certificate properly endorsed for transfer.

    "Wellston Hills Realty Company,
      "By Cyrus Crane Willmore
          "President.
    "Assignment.

"For value received I hereby sell, assign and transfer unto ...... all my right, title and interest in the within certificate and in the Syndicate therein referred to.

  "Dated ...... 19...

        ..........
"Witness: ..........

"7. The rights of Syndicate Subscribers are transferable and they are subject also to all the provisions and conditions referred to in the foregoing form of certificate."

In addition to the issue as to the existence of a trust—an issue not necessary to be considered in order to determine this case—petitioner contends (under several headings) that there is no evidence to support the determination of the Board that it is an "association" but, on the contrary, the evidence establishes that the Syndicate subscribers were merely creditors of the Realty Company—repayment of the loans to them being contingent upon successful operation.

These subscriptions were not loans. Any recoupment by the subscribers was entirely contingent upon the success of the enterprise and such recovery was to cover not only the principal advanced by the subscribers but also all profits from the enterprise. While provision is made for payment of 6% annually to the subscribers upon the amounts respectively advanced by each, yet the instrument carefully refrains from calling these payments interest. Such payments are from the Fund and not by the Realty Company from its general assets. All personal responsibility of the Realty Company for repayment of the advancements is expressly disavowed. Such provisions are, to say the least, quite unusual in connection with loans.

Is this an "association" within the revenue statute as that term is defined in the Morrissey case, supra? Clearly these parties were associated together. The contract brought their money together and defined the rights of the parties. It created a fund, set forth the uses thereof, the party solely entitled to direct usage thereof, the interests of the various parties and the disposition of the fund. Also, this association of individuals was for a business undertaking. The sole inducement for participation was the hope of making money through the acquisition, improvement and sale of a tract of land. Thus the petitioner met the requirements of an association in the respects that it brought together various individuals in a common enterprise for business purposes.

The question remains as to whether this association so far revealed similarity to a business corporation as to bring it within the statute. There was centralization of control in that the Realty Company—the "Syndicate Manager"—had sole control of the Fund under the provisions and limitations set forth in the contract. There was a continuity of interests and an express disavowal of a partnership relation. There was an express limitation of liability to the amount of the respective subscriptions. There was express power of transferability of individual interests. These characteristics fit, like a glove, the analogy to a corporation declared by the Supreme Court to

928

be sufficient in A. A. Lewis & Co. v. Commissioner, 301 U.S. 385, 388, 57 S.Ct. 799, 801, 81 L.Ed. 1174, where, in commenting on the Morrissey case, the Court said: "We pointed out that the corporate analogy was evidenced by centralized control, continuity and limited liability, as well as by the issue of transferable certificates; and we said (296 U.S. 344, at page 356, 56 S.Ct. 289, 295, 80 L.Ed. 263) that the word 'association' implies associates."

We think petitioner was an "association" within the meaning of the statute and, as such, was taxable thereunder. The determination of the Board is

Affirmed.