**FIDELITY–BANKERS TRUST CO. et al.
v. HELVERING, Commissioner of Internal Revenue.**

**HELVERING, Commissioner of Internal
Revenue, v. FIDELITY–BANKERS
TRUST CO. et al.**

Nos. 7271, 7272.

United States Court of Appeals for the
District of Columbia.

Decided March 4, 1940.

Writ of Certiorari Denied June 3, 1940.
See 60 S.Ct. 1102, 84 L.Ed. ——.

Forrest Andrews, of Knoxville, Tenn., for Fidelity-Bankers Trust Co. and others.

Sewall Key, J. P. Wenchel, Paul E. Waring, and L. W. Post, all of Washington, D. C., for Commissioner of Internal Revenue.

Before GRONER, Chief Justice, and MILLER and RUTLEDGE, Associate Justices.

RUTLEDGE, Associate Justice.

Fidelity-Bankers Trust Company (the Trust Company) appeals from a decision of the United States Board of Tax Appeals[1] holding it liable, as trustee for Fidelity Realty Company (the syndicate), to pay tax on $4,474.06 income for the year 1933. The Commissioner of Internal Revenue appeals from the Board's refusal in the same decision to hold the Trust Company liable to pay tax on $10,009.69 and $13,041.94, alleged to have been income of the syndicate during the years 1932 and 1933 respectively. The principal questions to be decided are: (1) Whether the syndicate is an association which is taxable as a corporation within the meaning of the taxing statute;[2] (2) whether, if so, money paid to the syndicate by the Trust Company pursuant to a guaranty is income taxable to the syndicate.

The Trust Company is a Tennessee corporation engaged in the general banking and trust business at Knoxville, Tennessee. Its chief business consists of lending money which is secured by first mortgages or trust deeds on real property in or near Knoxville, and selling its own interest-bearing bonds secured by these mortgages and trust deeds. In 1931, because of maturities on its bonds and a decline in its collections of principal and interest on real estate loans, the Trust Company faced serious financial embarrassment and probable receivership proceedings. To meet this situation arrangements were made whereby nineteen individuals and a company, substantially all of whom were stockholders or directors of the Trust Company, formed the syndicate, one purpose of which was to advance to the Trust Company up to $510,000 under the terms of a declaration of trust executed on October 20, 1931. By one provision the Trust Company guaranteed that the syndicate's annual profits would equal six per cent on the face value of outstanding syndicate certificates, and in exchange for this guaranty the Trust Company was to take all syndicate profits exceeding that sum. Pertinent portions of the declaration are set forth in the margin.[3]

The fundamental difference concerns the construction and legal effect of the in-

---

[1] 1938, 37 B.T.A. 142.

[2] Section 1111 of the Revenue Act of 1932, 47 Stat. 169, 289, 26 U.S.C.A. Int. Rev.Code, § 3797.

[3] "The parties of the first Part are desirous of organizing a syndicate to be known as the Fidelity Realty Company, for the purpose of acquiring, encumbering, leasing and selling certain real estate and/or other properties belonging to and/or to be hereafter acquired by the Fidelity-Bankers Trust Company, which company is desirous of disposing of same for cash * * * and/or other properties, to be approved in writing by the Fidelity-Bankers Trust Company.

"The parties of the first part hereby subscribe for and agree to pay either in cash, notes, assets or securities, acceptable to the majority of the syndicate owners, and approved in writing by Fidelity-Bankers Trust Company, to the party of the second part, upon call of a majority of the syndicate owners, as needed for the purposes hereinafter expressed, the following amounts [specifying]. For which the said trustee shall execute and deliver to parties of the

**16**

strument. The taxpayer says it is in substance nothing more than an arrangement for loans by the individual subscribers to the Trust Company and for securing them by provisions amounting to no more than a mortgage or deed of trust on the property. Implicit is the view that the syndicate is a mere name or mode of designating the individual subscribers, not an entity, association, corporation or business for purposes of the act. The Commissioner takes the contrary position, regarding the syndicate as a taxable entity distinct from the subscribers and the Trust Company, and as such engaged in a separate and distinct business of its own.

---

first part participating certificates of ownership in said syndicate * * * which certificates shall be transferable by endorsement and delivery, and a record of the ownership of said certificates of ownership is recorded on the records of the syndicate. * * * Party of the second part shall, until otherwise instructed by the majority of the syndicate owners, keep the records of all minutes of the meetings of the syndicate owners. * * * PROVIDED, HOWEVER, that no additional parties may become interested in the syndicate except by consent of a majority of the syndicate owners.

"The party of the second part shall purchase, receive, hold, manage, control, lease, encumber and/or sell such properties, as heretofore described, as a majority of the syndicate owners may, from time to time direct, in writing, and the syndicate shall have the power, right or authority to sell any or all properties belonging to it only upon such terms and at such prices as Fidelity-Bankers Trust Company, the guarantor herein, may agree to in writing. PROVIDED, HOWEVER, that in the event said Fidelity Bankers Trust Company shall fail or refuse to agree upon the price and/or terms of the sale of any properties the syndicate may determine to sell, a majority of the syndicate shall have the right to sell same to such persons, firms or corporations as it may desire, and upon such terms and conditions, and at such prices as it may determine after giving the said Fidelity-Bankers Trust Company the right to purchase same upon the same terms and conditions, and at the same price, and upon the failure and/or refusal of the said Fidelity-Bankers Trust Company to purchase same within ten (10) days after such option or right is given it in writing.

"The party of the second part shall take title to all properties purchased for the benefit of the syndicate owners, in its name as trustee, * * * and * * * the said trustee shall have authority to make sales, conveyances, encumbrances and/or leases, of any and all properties acquired by it as trustee for the above syndicate, without the necessity of the beneficiaries hereunder joining in the execution of any contracts, deeds, sales, leases, mortgages or deeds of trust executed by the trustee. * * *

"[Parties of the first part agree that after they have been reimbursed for the principal of their investments in the syndicate, together with rents from the real estate acquired, or from any other source of income, equal to the rate of 6% per annum, payable semi-annually, on the principal of their investments, all profits realized from the operation of the syndicate shall be conveyed by the trustee to Fidelity-Bankers Trust Company, this arrangement being made primarily for the benefit of said Fidelity-Bankers Trust Company; and in consideration of the anticipated profits hereinabove referred to, the Fidelity-Bankers Trust Company, in addition to its capacity as trustee hereunder, joins in the execution of this agreement upon its own responsibility as a banking and trust company, for the purpose of, and does hereby guarantee to the syndicate owners, the return of the principal invested by them, with a net rental income thereon equivalent to 6% per annum, semi-annually * * * but the said Fidelity-Bankers Trust Company shall be reimbursed therefor as soon as accumulated funds from income or profits on sales are available for such reimbursement.

"On or after November 1, 1936, any certificate owner may demand that Fidelity-Bankers Trust Company, in its aforesaid capacities, shall buy his certificate at the then principal thereof, and accrued rentals thereon on a 6% per annum basis, payable semi-annually, to which the Fidelity-Bankers Trust Company, in its aforesaid capacities, hereby agrees.] At any time Fidelity-Bankers Trust Company shall have the right to purchase all of said certificates outstanding at par and accrued rentals thereon, but shall not have the right to purchase less than the entire outstanding certificates without the consent of all of the syndicate owners. (Brackets supplied, cf. note 25 infra.)

"PROVIDED that, in no event, shall this trust extend beyond a period of twenty-one years from the date of this instrument.

"Any and all monies belonging to the syndicate arising from the sale of any

During the fiscal year ending October 31, 1932, operation of the syndicate properties resulted in a loss of $2,156.06, but for that ending October 31, 1933, a profit of $4,474.06 was realized. In those years the Trust Company, pursuant to its guaranty, paid $12,165.75 and $13,041.94, respectively, to the trustee, which enabled it to pay the syndicate subscribers their guaranteed six per cent. The Commissioner considered these payments as income to the syndicate and therefore deducted the operating loss for 1932 from the guaranty payment for that year and assessed taxes against the syndicate on the difference and the whole amount paid for 1933. The Board held that the guaranty payments were made "under an obligation running directly from the Trust Co. to the certificate owners," and therefore were not taxable to the syndicate, although its profits on operating the properties for 1933 were held taxable.

I. Was the syndicate a taxable association?

We are concerned here with a trust. Taxability as an association or corporation no longer turns on technical differences in organizational structure[4] nor on the degree of control given to beneficiaries in management of trust affairs.[5] Simulation by unincorporated organizations of corporate forms and approximation of corporate advantages by skillful use of trust and contract devices have brought legislative classification with technical corporations for taxation and other purposes, and like action independently by courts.[6] But not all trusts are taxable as corporations. Under the pertinent statutes only those engaged in doing business for profit or income are so taxed. A trust does not engage in business, for purposes of the tax, if its sole or principal object and activities are: (1) preservation of specified property;[7] (2) liquidation of a trust estate;[8] (3) distribution of income derived from another source.[9] Clearly the same rule should apply if its function is ex-

---

properties, shall be disbursed to the syndicate owners, pro rata, or reinvested, by the trustee, as directed in writing by a majority of the syndicate owners, and the guarantor, Fidelity-Bankers Trust Company.

"It is hereby expressly understood and agreed between the parties hereto, and all parties dealing with said trustee, that the owners of the syndicate certificates hereunder are not and shall not be personally and/or individually liable for any obligations incurred by the trustee, whether by note, deed of trust, or otherwise, and that only the properties belonging to the syndicate or trust herein created shall be liable for such obligations, and that notice to this effect shall be stated in every bond, note, contract, or any other written obligation made by the trustee hereunder. * * *

"The term, 'a majority of the syndicate owners', used throughout this declaration of trust shall mean, in each instance, a majority of the dollar ownership of the principal of the syndicate certificates then outstanding, either in person, by proxy, or by legally constituted authority as disclosed by the records of the syndicate.

"The trustee hereby agrees to charge no compensation for its services hereunder."

[4] Cf. the definitions of the statute cited supra note 2.

[5] Hecht v. Malley, 1924, 265 U.S. 144, 44 S.Ct. 462, 68 L.Ed. 949; Morrissey v. Commissioner, 1935, 296 U.S. 344, 352, 353, 56 S.Ct. 289, 80 L.Ed. 263; Commissioner v. Vandegrift Realty & Investment Co., 9 Cir., 1936, 82 F.2d 387. As to the formerly prevailing view, cf. Crocker v. Malley, 1919, 249 U.S. 223, 39 S.Ct. 270, 63 L.Ed. 573, 2 A.L.R. 1601; Treas.Reg. 45, art. 1504; id. 62, art. 1504.

[6] Cf. Hemphill v. Orloff, 1928, 277 U.S. 537, 48 S.Ct. 577, 72 L.Ed. 978.

[7] Myers v. Commissioner, 7 Cir., 1937, 89 F.2d 86; Cyrus H. McCormick v. Commissioner, 1932, 26 B.T.A. 1172.

[8] Blair v. Wilson Syndicate Trust, 5 Cir., 1930, 39 F.2d 43; Fisk v. United States, D.C.Mass.1932, 60 F.2d 665; Helvering v. Washburn, 8 Cir., 1938, 99 F.2d 478; cf. Morrissey v. Commissioner, 1935, 296 U.S. 344, 361, 56 S.Ct. 289, 80 L.Ed. 263.

[9] Gardiner v. United States, 1 Cir., 1931, 49 F.2d 992; Lansdowne Realty Trust v. Commissioner, 1 Cir., 1931, 50 F.2d 56; Tyson v. Commissioner, 7 Cir., 1931, 54 F.2d 29; Trust No. B. I. 35 v. United States, D.C.S.D.Cal.1938, 25 F. Supp. 608; Terminal Properties Co. v. Commissioner, 1930, 19 B.T.A. 584; Jackson-Wermich Trust v. Commissioner, 1931, 24 B.T.A. 150; cf. Zonne v. Minneapolis Syndicate, 1911, 220 U.S. 187, 31 S.Ct. 361, 55 L.Ed. 428; and see Hecht v. Malley, 1924, 265 U.S. 144, 161, 44 S.Ct. 462, 68 L.Ed. 949.

clusively to service the security for a loan. The ultimate question is whether the trust performs some nonbusiness[10] function of this sort or operates a business enterprise as a going concern.

But often the conditions of modern business make the distinction close. Preservation, liquidation, and securing of loans frequently approach the proportions of conducting a business. Years and voluminous transactions, which often are profitable, may be required. Nor is the distinction between making a loan or loans and engaging in the business of lending money always simple. The modern corporate mortgage or deed of trust, with elaborate provisions for creditors' intervention in management under long-term financing, coupled with the issuance of limited participations to shareholders by the corporate mortgagor, has blurred the old sharp distinctions between giving "security" and "doing business," "creditor" and "owner," managing entrepreneur and creditors' committee.

Accordingly, a particular arrangement may present inconsistent and perplexing analogies. The conversion or perversion, as the case may be, of the trust from its historic conserving function to entrepreneurial purposes has been a perpetual source of such conflicts in other matters than taxation.[11] Whether therefore a particular arrangement of this sort creates basically a debtor-creditor relation, with incidental provisions for security, or establishes a business enterprise as an independent entity requires something more than impressionistic answer. Where the technical form of organizational structure, the activities actually conducted, and the purpose of the organizers, both as expressed in the documents and as carried out consistently, point to a single basic function, the solution is not difficult. It becomes so when these elements or some of them are in conflict. It is possible still to draw a corporate mortgage or deed of trust, even a complicated one, which will be that and nothing more. But when men reach out for legal advantages by technical arrangements which confuse not only functions but forms, and are not consistent with their real objectives, or if so, those objectives are conflicting, only confusion can result for them and, unfortunately, too often for the law.

■ ■ Formerly the Board and the courts stated that "the crucial test must be found in what the trustees actually do, not in the mere existence of long unused broad powers."[12] But recent Supreme Court decisions have shifted emphasis to simulation of corporate attributes[13] and the purpose for which the trust is organized as expressed in the creative instruments.[14] The language quoted concerning the latter factor from Helver-

---

[10] That transactions of a business character are necessary incidentally to the preservation, liquidation, etc., of the security does not without more convert a trust having such primary objectives into a business enterprise. Cf. note 24 infra.

[11] As, for instance, in the contradictory analogies to the law of partnership and that of trusts in fixing the individual liabilities of trustees and beneficiaries of the business trust.

[12] Gardiner v. United States, 1 Cir., 1931, 49 F.2d 992, 996; Lansdowne Realty Trust v. Commissioner, 1 Cir., 1931, 50 F.2d 56; Tyson v. Commissioner, 7 Cir., 1931, 54 F.2d 29; Terminal Properties Co. v. Commissioner, 1930, 19 B.T.A. 584; Jackson-Wermich Trust v. Commissioner, 1931, 24 B.T.A. 150; Cyrus H. McCormick v. Commissioner, 1932, 26 B.T.A. 1172.

[13] Morrissey v. Commissioner, 1935, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263, enumerating and holding sufficient five points of similarity to a corporation:

(1) title held by trustees as a continuing body during the life of the trust; (2) centralized management by trustees; (3) continuity or "perpetual succession"; (4) transferable shares; (5) limited liability. Some cases seem to require a coincidence of all, e. g., Commissioner v. Gerstle, 9 Cir., 1938, 95 F. 2d 587. This court has held that limited liability is not an essential characteristic of an association. Bert v. Helvering, 1937, 67 App.D.C. 340, 92 F.2d 491; cf. Kilgallon v. Commissioner, 7 Cir., 1938, 96 F.2d 337. And it has been held that the formal characteristics are of secondary importance, the important issue being whether the trust device is being used by a group of individuals to carry on a business for profit. Commissioner v. Vandegrift Realty & Investment Co., 9 Cir., 1936, 82 F.2d 387; and see Note (1932) 42 Yale L.J. 270.

[14] Morrissey v. Commissioner, 1935, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263; Swanson v. Commissioner, 1935, 296 U. S. 362, 56 S.Ct. 283, 80 L.Ed. 273; Helvering v. Combs, 1935, 296 U.S. 365,

ing v. Coleman-Gilbert Associates[15] has brought a shift in the policy of the taxing authorities,[16] and was the basis of the Board's decision in this case.[17] It is not necessary to assume from the recent decisions that the language of the trust instrument as to purpose will be conclusive in all cases, or that actual activities or unexpressed purposes always will be irrelevant. But when the expressed objectives and powers are appropriate to conducting a business enterprise, and all or most of them actually are carried out and exercised, the existence of an unexpressed intention not to engage in business cannot counteract their effect and amounts to no more than a misconception of the nature of the activity or an intention to escape taxation. There are circumstances in which the distinction of function is so shadowy that the technical arrangements entered into must be controlling, and that is true though the parties may not have understood them and their consequences fully or had actual intentions which were contradictory.[18] A further statement of the facts is necessary for application of these principles.

■ The motivation for creating the trust was to provide relief for the Trust Company. It was on the verge of crashing and carrying down with itself other important financial institutions. Normal financial arrangements could not be made. No single individual could or would supply the amount required. The subscribers were interested as shareholders and directors in the Trust Company, some of them heavily, and some also in other institutions endangered by threat of its failure. Not from pure altruism therefore, but because their vital interests were at stake, they were ready, willing and able to aid. But they were neither ready and willing nor able to do so individually. No one offered to lend any sum separately to the distressed concern, with or without security. The record shows clearly that individual loans were regarded by all as impracticable, undesirable, and insufficient for the essential purpose. Joint action was required, and was taken. But it was not taken in the usual form of loan and security by way of mortgage or deed of trust. The customary legal techniques for handling loans and security by mere joint adventurers or co-lenders also were inadequate.

The plan evolved was designed admirably to provide a maximum of immediate and future relief to the Trust Company and at the same time a minimum of risk with a guaranteed return to the rescuers. It was embodied in the trust agreement. This was a tri-party contract, executed by (1) the subscribers; (2) the Trust Company in its private corporate capacity; (3) by it also as trustee for the syndicate. The agreement created the trust, not along lines customary in making loans or securing them, but with all the usual characteristics of a business trust. Modifi-

56 S.Ct. 287, 80 L.Ed. 275; Helvering v. Coleman-Gilbert Associates, 1935, 296 U.S. 369, 56 S.Ct. 285, 80 L.Ed. 278. In the latter case the Court said "We agree with the Circuit Court of Appeals that weight should be given to the purpose for which the trust was organized, but that purpose is found in the agreement of the parties. Not only were they actually engaged, as the Board of Tax Appeals determined, in carrying on an extensive business for profit, but the terms of the trust instrument authorized a wide range of activities in the purchase, improvement and sale of properties in the cities and towns of the State. The parties are not at liberty to say that their purpose was other or narrower than that which they formally set forth in the instrument under which their activities were conducted. Undoubtedly they wished to avoid partition of the property of which they had been co-owners, but their purpose as declared in their agreement was much broader than that." 296 U.S. 373, 374, 56 S.Ct. 287, 80 L.Ed. 278. This holding was followed in Commissioner v. Vandegrift Realty & Investment Co., 9 Cir., 1936, 82 F.2d 387. Cf. Morrissey v. Commissioner, supra, 296 U.S. at page 361, 56 S.Ct. 289, 80 L.Ed. 263.

15 Cf. the preceding note.

16 Cf. Treas.Reg. 101, art. 901–903: "The purpose will not be considered narrower than that which is formally set forth in the instrument under which the activities of the trust are conducted."

17 Cf. 1938, 37 B.T.A. 142.

18 As in the situation when associates do those things which in legal effect constitute a partnership, though subjectively their intention is not to form one. Cf. Merrall v. Dobbins, 1895, 169 Pa. 480, 32 A. 578; Bacon v. Christian, 1916, 184 Ind. 517, 111 N.E. 628.

cations adapted the mechanism to the peculiar objectives of the particular situation.

The agreement, of itself, created no relation of debtor and creditor between any subscriber or all of them and the Trust Company. The subscribers made no contract to advance *any* sum to the Trust Company. They agreed merely to pay to the trustee the sums set opposite their names, not on demand of the Trust Company, whether in its private capacity or that of trustee, but on call of a majority of the syndicate associates. All advances were so made. When made, they did not become automatically the property, legally or in equity, of the Trust Company (except in its capacity as trustee for the syndicate). To accomplish that, further *action by the majority of the associates* was required. Only when they had approved a further and aggregate advance to the Trust Company by the syndicate, and taken additional property from it in exchange, whether by way of "security" or otherwise, did it receive the funds freed from the limitations of the trust. The advances by individual members, therefore, had none of the characteristics of individual loans, either to the syndicate or to the Trust Company. They were subscriptions to the capital of the syndicate. The entire arrangement for syndicate collection and disposition of the funds subscribed was inconsistent with either individual debtor-creditor relationships with the Trust Company or a single one in the nature of a joint adventure. The activity was associational, not individualistic. It involved capital, contributions to capital and use of capital in dealings with the Trust Company, not a single loan or several loans made through an intermediary by the contributories.[19]

This in itself is sufficient to dispose of the contention that the syndicate is not a taxable association, since all of the arrangements for "securing" the syndicate's advances to the Trust Company are colored in legal character by the nature of the basic transaction, i. e., the assembly of capital by individual contributions, and use in transactions of a business character with third persons. The peculiar fact here that the syndicate was organized to do business with a single customer does not convert that business into loans from its members to its customer. That would be true even if it could be admitted that the business between the syndicate and the customer consisted only of loans and not of purchases and sales or resales.[20]

But the basic conclusion is supported also by the general scheme, both in its corporate characteristics of structural organization and in the doing of business, as well in actual operations as in formal provisions of the agreement. The latter disclose all of the corporate attributes which business trusts commonly simulate, including provisions for continuity of the enterprise regardless of changes in individual constituency, centralized management, limitations of individual liability, transferability of shares and declaration of broad business objectives.[21] These more than comply with the requirements of Morrissey v. Commissioner, supra note 5. The

---

[19] Not only could the Trust Company not have sued on the declaration to compel any subscriber to advance a penny, but when it had received the money from the syndicate, its obligation was to repay the amount to the syndicate, not to the individual subscribers. No subscriber could have sued the Trust Company at law to collect the amount of his individual contributions which eventually through the syndicate found their way into its hands. The capital contributions of partners, associates and shareholders do not become "debts" because loans are made to third persons by the enterprise from the capital so assembled. That the Trust Company "guaranteed" return of the capital investments (after November 1, 1936, cf. notes 3 supra, 27 infra) does not negative these differences in liability, maturities, technical obligation and enforceability or, therefore, convert them into separate and individual loans to it. Cf. also note 20 infra.

[20] Were "the business" merely that of lending money to the Trust Company, the loans made to it by the syndicate were different in amounts and maturities from the contributions made by the subscribers to the syndicate. There was no effort by the trustee or the managing majority of the associates to correlate the "loans" made to the Trust Company and the contributions made to the syndicate by the subscribers or to specify that they should result in separate obligations to each subscriber enforceable by him directly in a suit against the Trust Company. Cf. note 19 supra.

[21] The contract stated frankly the "subscribers'" desire to organize a "syndicate"; gave it a business name; prescribed broad powers for the trustee, acting with approval of a majority of

prescribed corporate mores were carried out in actual operations by meetings of the subscribers, election of an executive committee of five, numerous meetings by it, the keeping of formal syndicate minutes, the formal adoption of resolutions by the associates and the executive committee, etc. At various times, on calls of the executive committee, the subscribers paid in to the trustee $417,000 and received certificates of ownership in the syndicate. Under directions from the syndicate, the trustee over a period of years purchased from the Trust Company property and notes costing $452,073.97 and assumed mortgages aggregating $43,650. The conveyances, in absolute form, were made to the "Fidelity-Bankers Trust Company, Trustee for the Fidelity Realty Company," and were recorded. In 1932, the syndicate borrowed $41,700 from the Trust Company, giving security in its own name, and guaranteed payment of $32,500 borrowed by the Trust Company from the Reconstruction Finance Corporation, receiving security from the Trust Company. The trustee rented and otherwise managed the numerous properties acquired by the syndicate, subject in all respects to the approval of its executive committee or the specified majority of certificate holders. All this constituted something more than the mere making of loans by the syndicate subscribers to the Trust Company. It was a regular and continuous course of business. The transactions were largely purchases and sales, not lendings and the giving of security, in form and in substance. If they had been the latter, they would have constituted a business of lending money, not the mere making of occasional loans. The syndicate was a business enterprise, not a mere security device. Its business was distinct in function, form and legal arrangement from that of the Trust Company. Had it not been

so, the syndicate would not have been formed. It was likewise separate from the private affairs of syndicate members. They made it so intentionally and advisedly—for purposes of securing themselves in investment and return, if not for those of paying taxes. Separation of entities often is merely formal, but here it was both formal and substantial, in constituency, in objectives, in control, in liabilities, in property and, we think, therefore, in subjection to taxation.

This conclusion is not overcome by the peculiar modifications introduced into the trust agreement to fit it to the particular situation. These included, among others, provisions limiting syndicate purchases to property acquired from the Trust Company or approved by it; requiring its approval of the consideration to be given for them (which would be necessary in any event); giving it a first option to repurchase properties acquired by the syndicate on terms offered by others and the right to purchase all (but not less) of the outstanding syndicate certificates "at par and accrued rentals"; and the unusual guaranty by the Trust Company of a six per cent return to the subscribers, in exchange for which it was given the right to take all syndicate profits exceeding that amount, which was, to say the least, of highly doubtful value. It is of course unusual for a business enterprise to limit its business so largely to a single customer; to contract its profits in excess of a specified figure away from its owners to another; to receive a guaranty that they will amount to that figure; and to give its single customer so large a voice in its management. From this, it is contended strenuously that the whole arrangement was one for loans with security, that the "profits" were "interest," the deeds were mortgages, the "certificates of ownership" were evidences of debt, and the syndicate a legal non-

---

syndicate owners, including purchase and sale of realty and other property, leasing it, collecting rents, in fact all the powers essential to a corporation or partnership engaged in a general business of dealing in real and personal property; obligated the subscribers to pay their subscriptions to the trustee on call of a majority of themselves; provided for issuance of "certificates of ownership"; made them transferable; contained provisions designed to negative individual liability of the trustee and certificate owners; fixed a term of twenty-

one years for existence of the trust; negatived necessity for joinder of the beneficiaries in conveyances by the trustee; and bound the trustee so that it could take no action without approval of the majority of the associates, a power which they in fact delegated formally to an executive committee of five. The control prescribed for and exercised by the associates or their authorized representatives was more than sufficient, it may be noted, to satisfy the formerly prevailing "control" test of Crocker v. Malley, supra note 5.

**22**

entity. But labels are not so potent, especially when devised after the fact to contradict the consistently contrary terms of the instrument and its clearly stated purposes and functions. It is true that these modifying provisions create relations of great intimacy and interdependence between the syndicate and the Trust Company. But they are not those of identity nor is the intimacy nearly so great as exists commonly between holding corporations and their subsidiaries, which admittedly are separate taxable entities.[22] The modifying features cannot be given the effect of obliterating the fundamental structural organization and function without doing violence to the instrument of creation, expertly drawn and executed by men of great business experience and capacity, and to their expressed intentions carried out in their conduct. Had this suit been one by a creditor of the Trust Company seeking to attach or levy upon syndicate property or by their individual creditors attempting to secure like relief, or by syndicate creditors attempting to reach their individual property, they would have been the first to assert the syndicate's independence both of the Trust Company and of themselves. The basic fallacy is in the assumption that because the Trust Company ultimately was relieved from its distress by the formation and operations of the syndicate, those operations became no more than loans to it by the syndicate subscribers. This confuses motivation with method and ignores the partial character of the motivation. Six per cent profit secured as this was by transfers of specific property, whether absolute or by way of mortgage, and the general credit of the Trust Company as well, also had its motivating part and, in such times, one that cannot be ignored. That the syndicate and its members were willing to limit the profits distributed to them in order to be sure of getting them does not convert them into "interest." Limited stock participations are now too common to permit such a conclusion.[23] The syndicate was a taxable entity within the statute's meaning.[24] It follows that

---

[22] There was here no identity of individual constituency, of management, of liabilities, or of capital or property. The syndicate associates were a selected and restricted group of the Trust Company's shareholders and directors. It does not appear that they were identical with the members of its Board of Directors. Their respective share and syndicate participations were not identical or proportionate. The syndicate could do nothing without the approval of a majority of its members (or the executive committee). The Trust Company could veto much of its action, not all, but could require nothing. Separateness so substantial precludes any notion of identity and cannot be demolished by the qualifying provisions.

[23] The activity, not the amount of the return or its limited or unlimited character, indicates the nature of the enterprise and determines taxability. Commissioner v. Highlands Evanston-Lincolnwood Subdivision, 7 Cir., 1937, 88 F.2d 355, relying on the cases in Morrissey v. Commissioner, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263, ff. Cf. Wellston Hills Syndicate Fund v. Commissioner, 8 Cir., 1939, 101 F.2d 924, where provision was made for a six per cent return, but the profits were not necessarily limited to that amount. Cases holding purported preferred stock dividends to be in reality "interest" are not in point. Cf. Arthur R. Jones Syndicate v. Commissioner, 7 Cir., 1927, 23 F.2d 833; Wiggin Termi-nals, Inc., v. United States, 1 Cir., 1929, 36 F.2d 893; Commissioner v. Proctor Shop, Inc., 9 Cir., 1936, 82 F.2d 792. Mere misnomer of a relation actually intended and which amounts to nothing more than that of debtor and creditor does not destroy the relation or convert it into some other. But the rule does not apply when the language used, the conduct of the parties and the relation actually intended as so indicated is not that of debtor and creditor. Fidelity Savings & Loan Association v. Burnet, 1933, 62 App.D.C. 131, 65 F.2d 477.

[24] Whether the test of taxability is to be found within the terms of the trust instrument or there and in the activities actually carried out. Cf. Title Insurance & Trust Co. v. Commissioner, 9 Cir., 1938, 100 F.2d 482, 485, 486; Kilgallon v. Commissioner, 7 Cir., 1938, 96 F.2d 337; Jackson v. United States, D.C.S.D.Cal.1938, 25 F.Supp. 613; Willis v. Commissioner, 9 Cir., 1932, 58 F.2d 121, 122. There are recent cases which appear to go outside the instrument to find a purpose less broad than it states and hold that the business activities carried on are only incidental to that purpose. Cf. Myers v. Commissioner, 7 Cir., 1937, 89 F.2d 86; Trust No. B. I. 35 v. United States, D.C.S.D.Cal.1938, 25 F.Supp. 608; Helvering v. Washburn, 8 Cir., 1938, 99 F.2d 478. We need not determine whether these decisions represent the presently prevailing law or are consistent with other decisions of

the tax was assessed properly on the profit realized in 1933 from operating the syndicate properties.

■ ■ II. We think the Board correctly held that the guaranty runs directly to the certificate holders, not to the syndicate as such. It is part of the entire provision relating to profits[25] and its meaning must be determined from that provision as a whole. The language is susceptible of several interpretations regarding the obligee intended.[26] But the argument has been limited to the two views here presented.

Several factors may be said to support the view that the guaranty was intended to run to the syndicate. It was part and parcel of the syndicate's agreement with the Trust Company. It was given expressly in consideration of the syndicate's promise to pay to the corporation all profits exceeding the certificate holders' guaranteed six per cent, and to reimburse the Trust Company for the guaranty payments if and when accumulated profits should be available for such a purpose. The phrase "in its aforesaid capacities" used in the provision obligating the Trust Company to purchase the certificates on or after November 1, 1936,[27] implies that the Trust Company was a party to the guaranty both in its private capacity and as trustee. The method used for payment was by crediting the aggregate amounts due under the guaranty to the trustee's account with the Trust Company and disbursements to individual certificate holders from that account.

But that view makes the trustee both guarantor and obligee of the guaranty.[28] The mode adopted for payment was consistent with mere convenience in disbursement and bookkeeping under an obligation running directly to the syndicate members. The subscribers also were parties to the agreement and gave up their rights to profits exceeding six per cent in exchange for the guaranty of that amount. We do not believe they intended the payments to go into the general assets of the trust, thereby become subject to payment of expenses and other obligations, and perhaps never become available to them. Further, the guaranty expressly includes return of both principal and income. The guaranty of principal can have no pertinence to transactions between the syndicate and the Trust Company. It can relate reasonably only to the capital contributions made to the syndicate by its members. We think the same obligee was intended for both guaranties. Except for the phrase "in its aforesaid capacities," the entire provision is consistent with an intention to make the guaranty run only and directly to the certificate holders, not circuitously through the entity with the consequence that the payments might never reach the members. The language of the guaranty clause, "in addition to its capacity as trustee," etc., means not that the corporation executed *two* guaranties, one to the syn-

---

the same courts. Cf. Commissioner v. Highlands Evanston-Lincolnwood Subdivision, 7 Cir., 1937, 88 F.2d 355; Jackson v. United States, D.C.S.D.Cal.1938, 25 F.Supp. 613; Wellston Hills Syndicate Fund v. Commissioner, 8 Cir., 1939, 101 F.2d 924, and notes 10, 14, 16 supra.

[25] See the bracketed portions of the trust instrument, note 3 supra.

[26] Namely: (1) only the syndicate subscribers; (2) only the syndicate as an entity; (3) both the syndicate and its members individually; (4) to the subscribers only, but running from both the corporation and the trustee, i. e., the syndicate (cf. text circa note 27 infra); (5) as in (4), but with the corporation's guaranty running both to the syndicate and to the subscribers. Only the first and second are urged and, therefore, considered here.

[27] See the last sentence of the bracketed language, note 3 supra. It is possible to construe the provision for repurchase of certificates as entirely independent of the guaranty or as in fact part of it, prescribing both the time and the manner of its enforcement. If independent, its terms cannot affect the construction of the guaranty clause. If dependent and inconsistent, the subsidiary provision should give way to the primary one to the extent of the inconsistency.

[28] Except for the fact that the argument has been limited as stated in note 26 supra, there would be no essential inconsistency in the trustee's occupancy of such a dual situation. It could not, of course, be both guarantor and obligee of the same obligation, if it were limited to two parties. But there is nothing which would prevent an obligee from receiving a guaranty made to it *and others*, and in turn guaranteeing to its co-obligees that the guarantor would perform the primary obligation to all. But such a construction, though justified by some of the language, has been eliminated here.

dicate and another to the individual subscribers, but that in addition to the obligations assumed under the entire instrument as trustee, it also obligated its private and general corporate credit by a separate and independent guaranty to the individuals. The situation bears some analogy to the guaranty by a holding corporation of specified limited dividends upon shares of its subsidiary. That the shareholder receives under the guaranty exactly what he would have received had the subsidiary earned profits which it did not earn does not make the guaranty payments income of the subsidiary. The Board rightly applied the principle of New England Power Co. v. Commissioner, 1932, 25 B.T.A. 195.

The decision of the Board is affirmed on both appeals.

Affirmed.