**RAYMOND–ELDREDGE CO., Inc., v. SE-CURITY REALTY INV. CO. et al.**
(two cases).
**Nos. 7551, 7587.**

Circuit Court of Appeals, Sixth Circuit.
June 28, 1937.

170

Frank H. Shaffer, Jr., of Cincinnati, Ohio (John Weld Peck, Floyd C. Williams, and Peck, Shaffer & Williams, all of Cincinnati, Ohio, on the brief), for appellant.

Sidney G. Stricker and J. Louis Kohl, both of Cincinnati, Ohio (Edgar M. Johnson, Robert Lawrence Pastner, Samuel W. Baxter, Charles P. Stewart and Wm. C. Willging, all of Cincinnati, Ohio, on the briefs), for appellees.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

SIMONS, Circuit Judge.

In a suit brought by the Security Realty Investment Company to foreclose upon a vendor's lien in a deed of brewery property at Newport, Ky., to the Wiedemann Brewing & Distilling Company, the appellant as the owner of preference stock in the Wiedemann Company intervened on behalf of itself and other stockholders of the same class. It sought by its original and amended petitions to establish an equitable lien in favor of preference stockholders in the brewery property, to cancel common stock issued to promoters of the brewery corporation and disallowance of their claim to promotion fees represented by notes. From orders dismissing the intervening petition as to the several defendants the intervener appeals, No. 7551 being an appeal from an order denying relief as against the Security Realty Investment Company, and No. 7587 being an appeal from an order or decree denying relief against the Pollak Securities Corporation and its assignee, the Two Seventy Park Avenue Corporation.

The Wiedemann Brewery had been a successful enterprise, with valuable good will in the Cincinnati district, in the days before the enactment of the National Prohibition Law (27 U.S.C.A.), and was owned at the close of the prohibition era by the Security Realty Investment Company, an Ohio corporation, of which the stockholders were primarily members of the Wiedemann family, represented upon its board by Walter B. Weaver, who was given broad powers as trustee, agent and director of the corporation. With repeal of the prohibition law imminent, Pollak, through the Pollak Securities Corporation, which he owned and controlled, undertook the promotion of a company to purchase and operate the brewery, and secured from Weaver an option to purchase the brewery property for $950,000 on terms. This and a second option not having been exercised, Pollak in June of 1933, entered into an agreement with Weaver for the purchase of the brewery property for $1,000,000 upon modified terms, he and his associates making a down payment of $50,000 on the purchase price. The Wiedemann Brewery Corporation was then organized under the laws of Delaware, and to it Pollak transferred the purchase agreement for $1,350,000, the corporation assuming Pollak's obligations thereunder, voting Pollak 200,000 shares of its common stock, and issuing to him notes for $300,000 as his profit and promotion fee upon the transaction. The notes were thereafter reduced to $230,000 to meet the requirements of the Ohio Securities Commission when the shares of the company were qualified for sale in that state. Shortly thereafter Security, in pursuance of the agreement, delivered to the Wiedemann Corporation its warranty deed to the brewery property and equipment, reserving to itself a vendor's lien for the unpaid balance of the purchase price.

In July the charter of the Wiedemann Company was amended to authorize 200,000 shares of preference stock, by the sale of which to the public it was expected that it would be able to pay the balance of the purchase price upon the property and to recondition and operate it. Panton & Co., New York brokers, were employed to market the stock, and it was qualified

in a number of states, including Ohio and Minnesota, where Panton offered it to the public through local brokers, including the appellant, a brokerage firm operating in St. Paul and Minneapolis.

The sale of the preference shares did not proceed as rapidly and as successfully as was anticipated. Of its avails to the company $110,000 was expended in rehabilitating and re-equipping the brewery. About August 1, 1933, it became apparent that sufficient stock would not be sold to enable the corporation to make the payment of $450,000 to Security on the purchase price due August 27, 1933, so an arrangement was made with Security by which, in lieu of the agreed payment, Security would accept $112,940 in cash, $37,060 in preference stock, represented by 3400 shares, and $300,000 in notes of the Pollak Securities Corporation and Carter Securities Corporation, upon the condition that the notes were accepted by the vendor as additional security without prejudice to the enforcement of its purchase money lien. This arrangement was carried out, with approval of both corporations recorded in their respective minutes.

Thereafter the sale of stock by the intervener and other brokers continued, and it is claimed that this was in reliance upon a telegram received by them from Panton & Co. advising that Pollak had informed Panton that the August 27th installment on the vendor's lien had been paid. Some time thereafter, however, owing largely to market conditions, the sale began to decline, until by November, 1933, it was impossible to market more stock, and so impossible for the brewery company to pay any more upon the purchase price, except $5,000 on account of interest. The rehabilitation of the brewery continued, however, through December. In March, 1934, the present suit was brought by Security to foreclose its lien and recover the property. Weaver was appointed receiver in May, and the intervener filed its petition late in 1935 when it became apparent that operation under receivershp was no longer advisable, and that Security intended to press its foreclosure suit to decree and sale. Subsequently the property was appraised at $1,161,419.49, offered for sale to the public on June 18, 1936, and bid in by the vendor at two-thirds of its appraised value.

■ It is the contention of the appellant that the Pollak claim for $230,000 should be disallowed, and its 200,000 shares of common stock canceled because there was no consideration therefor, and because the brewery property had been greatly overvalued. There is persuasiveness in the response that the issues are moot because the funds held by the receiver are insufficient to satisfy lien claims and those of general creditors, leaving nothing for preferred stockholders. Hamlin v. Toledo Railroad Co., 78 F. 664, 36 L.R.A. 826 (C. C.A.6). But aside from this the contention must be rejected because at the time of the sale of the brewery property to the corporation there were no existing preference shareholders, and those that came in afterwards were fully advised by the prospectus of the Pollak interest. The issues in this respect are controlled by the decision in Old Dominion Copper Mining Co. v. Lewisohn, 210 U.S. 206, 28 S.Ct. 634, 636, 52 L.Ed. 1025, and the reasoning there is precisely applicable here: "At the time of the sale to the plaintiff, then, there was no wrong done to anyone. Bigelow, Lewisohn, and their syndicate were on both sides of the bargain, and they might issue to themselves as much stock in their corporation as they liked in exchange for their conveyance of their land." McCandless v. Furlaud, 296 U.S. 140, 56 S.Ct. 41, 47, 80 L.Ed. 121, is not contra, and is expressly distinguished from the Lewisohn Case by Mr. Justice Cardozo as follows: "This is not a case where at the time of issuing the securities the shareholders and the promoters were the only ones concerned." Furthermore, the general corporation law of Delaware, section 14 (Rev.Code Del.1935, § 2046) provides that all questions of the value of property received for stock rest within the conclusive judgment of directors in the absence of actual fraud, and no fraud is here proved or found.

■■ It is the contention of the appellant in support of the relief claimed against Security that Security was from the beginning a promoter of the brewery company in that Dr. Weaver was a director of both corporations, in that Security knew that the brewery company had no capital, and that the purchase price could be obtained only through the sale of stock to the public. But if not an original promoter, it contends that it became one when the stock sale failed and payment could not be made as agreed, by failing then to rescind its agreement, accepting notes of doubtful value and permitting brokers thereafter to sell preference stock to innocent purchas-

ers for cash. The evidence fails wholly to establish Security as a promoter of the Wiedemann Corporation. It dealt with Pollak and with Wiedemann at arm's length, it had no interest in the brewery company, and its only concern was with the sale of its property. It probably knew that Pollak contemplated the formation of a company and the sale of stock therein, and it probably also knew that installments· on the purchase price of the brewery property would be paid out of the avails of such sale. There is nothing, however, unusual in this, and it is not a circumstance which without more would· establish a fiduciary relationship between Security and the purchasers of the preference shares. Security had no part in the arrangement by which the sale of stock was undertaken and carried out, it had no dealings with Panton & Co., it neither prepared nor distributed the prospectus, and so far as the record shows, it was not advised as to the progress of the stock subscription.

■ Dr. Weaver was, of course, a director of both corporations, and it is true that he had rather large powers on behalf of the stockholders of Security. His presence upon the board of the brewery company, however, is fully explained, and this explanation is neither refuted nor challenged. Weaver had formerly been connected with the old George Wiedemann Brewing Company, and it was deemed advantageous to have him connected with the new enterprise, wherein he was to act but in an advisory capacity. The prospectus so announced. Certainly Weaver occupied no controlling or dominating position in the brewery company, and it is not even clear that any stock certificates were ever issued to him. Clearly he did not represent Security upon the brewery board, and while there is a total failure of proof as to his actual knowledge of the details of the stock sale, such knowledge as he might have had is not to be imputed to Security. This is not a case in which a dominant individual who owns substantially all the beneficial interest creates several corporations and vests in them the· legal title to his property and endeavors to separate ownership among them, though in reality it is substantially all his. · In such a case the court will look through the· form of the legal entities to the real owners and to the controlling power, and impute his knowledge to all his corporations. Ohio Millers' Mutual Insurance Co. v. Artesia

State Bank, 39 F.(2d) 400 (C.C.A.5); American National Bank v. Miller, 229 U. S. 517, 33 S.Ct. 883, 57 L.Ed. 1310. Cf. Anderson v. Missouri State Life Insurance Co., 69 F.(2d) 794 (C.C.A.6). Geddes v. Anaconda Mining Co., 254 U.S. 590, 41 S. Ct. 209, 65 L.Ed. 425, does not go beyond this. It is true that transactions between boards having common members are jealously regarded, and where the fairness of such transactions is challenged, the burden is upon those who maintain them to show their entire fairness. But the original sale of the brewery property by the one corporation to the other in this case was consummated before there were any preferred stockholders of the brewery company, and those who came in later did so with full and complete knowledge of the nature of that transaction, supplemented by the caution that the shares were "offered as a speculation." They were not deceived or overreached, and as to them no unfairness resulted from the presence of Dr. Weaver upon the brewery company board, of which they were fully advised.

■ We come then to the last and principal contention of the intervener, which is that even though Security was not an original promoter, it became one by accepting other than cash in full settlement of an installment upon the purchase contract, by permitting prospective purchasers of stock to be informed that it had been fully paid, by failure to rescind its contract, by permitting $110,000 to be devoted to rehabilitation of plant instead of insisting on its being paid upon the contract, and by delaying foreclosure until it had become clear that no more stock could be sold to the public. It is urged that Security is now in consequence estopped to deny that the full $450,000 installment had been paid, and that the intervener and others of the same class are entitled to a lien upon the foreclosed property to the extent of the moneys invested in the preference shares. It is indeed strange doctrine that a creditor by an act of grace to its corporate debtor becomes liable for its debtor's acts, and that by easing the burden of an oppressive contract it shares in the fiduciary relationship of the debtor to its stockholders. Of course there must be recognition of the principle that one who knowingly and intentionally clothes another with power to commit a fraud, and knowing that such fraud is being committed remains silent, may be liable.

But no such situation is here presented. The Security Company had nothing to do with the sale of the brewery stock. There was no privity between it and Panton & Co., and as to the alleged telegram from Panton to the intervener, there was complete failure of proof that Security had any knowledge either of it or of the alleged representation by Pollak it purported to convey.

For the brewery to use its funds in the rehabilitation of the brewery property was clearly within its power. The primary corporate purpose of a brewery corporation is to operate a brewery. It requires no evidence to demonstrate that an idle plant in disuse for fifteen or more years must necessarily require extensive and expensive rehabilitation. Without re-establishing it as a going concern, no value could have been given to its shares, common or preferred, and the necessity for and extent of such rehabilitation must rest within the sound discretion of the company's directors. With it Security had no concern, and no breach of trust or estoppel can arise out of failure of Security to take steps to prevent its renovation and rehabilitation. Finally, the purchasers of preference shares were fully advised as to the need for and the proposed expenditure for that purpose by the prospectus, which contained complete estimates for rehabilitation and purchase of new equipment.

The District Judge made full and complete findings of fact. They are not challenged. They support the conclusions of law announced, and sustain the order and decree.

Both are affirmed.