ANDERSON et al. v. LAMB.
ANDERSON et al.
v.
UNITED STATES.
Civ. Nos. 2470, 2471.

United States District Court,
D. North Dakota,
Southeastern Division.
March 15, 1954.

Richard A. Moore and Norman E. Biorn, St. Paul, Minn., and George A. Soule, Fargo, N. D., for plaintiffs.

P. W. Lanier, U. S. Atty., Fargo, N. D., and Benjamin H. Pester, Sp. Asst. to Atty. Gen., Washington, D. C. (H. Brian Holland, Asst. Atty. Gen., and Andrew D. Sharpe, Sp. Asst. to Atty. Gen., Washington, D. C., on the brief), for defendant.

VOGEL, District Judge.

These two suits are brought by the trustees of a purported liquidating trust for the refund of income taxes. The suit wherein the United States of America is the defendant is for $190,557.65 taxes paid for the years 1945 through 1948, plus interest from the time of payment. The suit against the Collector is for $70,921.23, representing taxes paid in the years 1949 and 1950, plus interest. The facts necessary to a determination of the plaintiffs' right to refund, as shown by the findings filed herewith, are as follows:

On June 24, 1902, the Northern Irrigation Company was incorporated as a Texas corporation, the expressed purposes of which were the constructing, operating and maintaining of a water irrigation system. The corporation acquired some 17,000 acres of land in Matagorda County, Texas, near the Colorado River. The corporation first engaged in the raising of rice and in the operating of an irrigation plant. Due to a fall in the water level of the Colorado River, sufficient water could not be obtained for the profitable operation of the corporation's irrigation system and the stockholders decided to dissolve the corporation and to liquidate its assets. On January 26, 1914 the dissolution was duly effected and a conveyance in trust of all of the assets was made from the corporation to three named trustees, Albert Anderson, J. C. Carlson and G. L. Elkin. By instructions contained in the corporate minutes of the Northern Irrigation Company, the trustees were directed to liquidate the assets as soon as could be done without sacrifice or injury to the beneficiaries, and to distribute the proceeds to the beneficiaries of the trust in accordance with their respective stock ownership on the date of the corporate dissolution after the payment of debts and expenses.

The trustees thereafter issued certificates of beneficial interest in exchange for the stock of the Northern Irrigation Company. Such certificates were transferrable. Some have been bought and sold and the trustees have maintained a certificate book.

In the first few years of the trusteeship, the trustees disposed of approximately 3,500 acres of land but otherwise substantially continued the operation of the dissolved corporation. In addition thereto, they expanded their irrigation system and went into the business of cattle raising. The original trustees bought and sold cattle, employed a ranch

manager, employed ranch laborers, irrigated their land for rice and raised and sold rice, cotton and other crops, such activity continuing through the year 1925.

During the early years of the trust, some of the tax returns were filed as trust returns and others as partnership returns. The return for 1918 was audited by the Bureau of Internal Revenue and in 1923 the Committee on Appeals and Review held that the trust was properly taxed as a strict trust for the year 1918. Like determinations were made for the years 1923 and 1924. For the year of 1925, the Bureau of Internal Revenue held that the trustees were taxable as an association engaged in business. The question as to such holding for the year 1925 was litigated before the Board of Tax Appeals in 1932. In holding that the trustees constituted an association for business purposes and hence taxable as a corporation, the Board of Tax Appeals, in J. C. Carlson and G. L. Elken, Trustees v. Commissioner, 1932, 27 B.T.A. 93, stated:

"Whether it was due to their inability to sell the trust assets, or their desire to improve and develop the property for a higher market price, it would seem clear from this record that after the first few years of their trusteeship the petitioners temporarily, at least, abandoned the idea of liquidating. Their investments in cattle, and changing from rice-growing to livestock-raising, along with other investments and improvements, show an intent, we think, to defer liquidating indefinitely.

\*   \*   \*   \*   \*   \*

"In the case at bar the petitioners have continued the operation of the properties of the dissolved corporation in the same manner and along the same lines as did the corporation and there is nothing in the record to indicate, even remotely, when they intend to liquidate them. We think that a reasonable latitude respecting operation should be given the liquidators of a corporation so as to avoid sacrificing the assets upon a low market, as well as to increase their sale price; but operations continued beyond a reasonable time, as we think the facts here show, must be treated as a continuation of the business of the dissolved corporation by the trustees."

As a result of the decision of the Board of Tax Appeals, rendered in 1932 covering the year 1925, the trustees in subsequent years prepared corporate income tax returns. In so doing, however, the trustees indicated in the body of the tax returns that they were filing on corporate forms because they were being taxed as a corporation.

The trustees continued the operations of the trust property under an employed manager until 1936, when the surface rights of the land owned were rented to their manager, Olaf Ulland, for a cash rental and the personal property belonging to the trust was sold to him.

In leasing the land to Ulland, the trustees reserved the right to sell the land free of the lease while Ulland agreed to keep the property in repair and was given the right to sublease. The lease was renewed in 1941, again in 1946, and finally expired on December 31, 1947. In 1940, the trustees sold a warehouse to Ulland. The evidence indicates that some efforts were made to sell the trust property, including negotiations with Ulland, the lessee, and others.

As early as 1924 oil companies became interested in the corporate property and since 1929 the trustees have executed oil leases to different parties. On August 26, 1937, the trustees executed an oil lease to L. E. McDonald covering approximately 2,800 acres of trust property. This lease was subsequently acquired by the Ohio Oil Company. On November 25, 1938, a producing well was drilled on such trust property. Thereafter, and up to 1951, 23 producing oil wells have been completed upon the trust property and in 1951 a gas well was also brought in.

Two of the three original trustees became deceased, leaving the remaining trustee John C. Carlson. On September 29, 1939, a meeting of the beneficiaries was held and a resolution unanimously adopted in which the beneficiaries consented to the resignation of Carlson, nominated three persons as successor trustees and authorized a petition to the District Court to effect the change and to provide additional powers for the trust. A petition was filed with the District Court of Matagorda County, Texas, a court of general jurisdiction with equitable powers, including power to adjudicate title to land. All of the beneficiaries of the trust were named as parties defendant and the Court was asked to appoint the three nominated persons as trustees. In such proceedings, the District Court was asked to and did grant, by order of January 29, 1940, additional powers to the newly appointed trustees: " * * * to borrow money for the benefit of the trust estate and, if required to do so, to secure the same by collateral on mortgage"; a provision that the trust should expire 20 years after the date of the order, with a further provision that upon application of any trustee or beneficiary the Court might order the trust continued for such additional time as might be necessary if such was for the best interest of the trust estate; the right of the Court upon the death, resignation or refusal to act of any of the trustees, to replace such trustees, but providing that no new trustee should be appointed until the Court had been presented with written application executed by a majority in interest of the beneficiaries and nominating the same for the Court's consideration; and providing compensation for trustees or successor trustees for services to be fixed by the vote of the owners of a majority in interest in the trust at any annual or special meeting of the beneficiaries.

The original deed of trust conveying the property from the Northern Irrigation Company to the trustees did not contain the direction to the trustees to reduce the trust assets to cash as soon as could be done without sacrifice or injury to the beneficiaries and to distribute the proceeds. Such direction was recorded only in the minutes of the meeting of the stockholders of the corporation. In the proceedings in the District Court, however, the petition set forth that the purpose of the trust was to reduce the trust assets to cash and to distribute the proceeds and the District Court found as a fact that said trust:

" * * * had as its sole and only purpose the reduction of the trust assets to cash as soon as could be done without sacrifice or injury to the beneficiaries and to distribute the proceeds * * *."

The District Court's order provided, among other things, as follows:

"The trustees are hereby ordered to reduce the assets of the trust to cash as soon as can be done without sacrifice or injury to the beneficiaries and to distribute the proceeds proportionately to the beneficiaries in accordance with their respective ownership of interest in said trust as shown by the books of said trustees and after paying all debts now due by said trust and expenses hereafter incurred by said trustees."

While the proceedings in the District Court of Matagorda County may not amount to a technical reconstitution of the trust, it certainly may be characterized as a rejuvenation of the trust. Since, in point of time, this rejuvenation followed a revival of oil activities and the bringing in of the first producing oil well on the trust property, it may properly be considered as significant. Note that the first producing well was brought in on November 25, 1938, and the activities with reference to the rejuvenation of the trust began in 1939, the consummation being effected January 29, 1940.

The evidence discloses that subsequent to the proceedings in the District Court, the successor trustees made further efforts to sell the trust assets. Such efforts culminated in the sale during 1947–1949 of all of the saleable surface

of the trust properties and the distribution of the proceeds to the beneficiaries. In such sales, the successor trustees reserved the mineral rights to the trust estate. It should be noted that, in 1946, prior to the sale of the surface rights, the trustees called a meeting of the beneficiaries and had them vote on the method of effecting the sale of the surface rights.

One of the sales of surface rights was to the Ohio Oil Company, covering about 1,400 acres on which the Ohio Oil Company then had producing wells under its prior oil and gas lease. After reserving the mineral rights, the trustees further reserved an option to buy back the surface estate within 40 years upon the contingency that a valid statute be enacted limiting the time that the minerals could be severed from the surface estate.

It will be noted that since 1929 the trust has received income in the form of bonuses, delay rentals and royalties from oil and gas leases of trust property, that the first producing well was brought in on November 25, 1938, and that since then 23 producing oil and gas wells have been completed on trust property. From 1945 through 1950 a total of nine oil and gas leases were executed on various other portions of the trust property. No producing wells have been completed thereon, although several attempts have resulted in dry holes.

During the tax years in question, the trustees have employed on a commission basis two men to help them negotiate oil and gas leases. In 1950 they employed an engineer for expert advice in connection with an agreement for unitization of oil-producing trust property with adjoining oil-producing properties. During the years in question, 1945–1950, inclusive, the trust's total income is made up as follows:

Schedule of Trust Income: 1945–1950:

| | 1945 | 1946 | 1947 | 1948 | 1949 | 1950 |
|---|---|---|---|---|---|---|
| Land rental: | $ 7,299.78 | $ 7,759.89 | $ 5,273.75 | $ 14,785.19 | $ 886.19 | $ ——— |
| Interest: | 280.00 | 591.70 | 493.60 | 6,478.78 | 11,326.91 | 5,753.27 |
| Oil lease rentals and bonuses: | 10,235.72 | 6,854.20 | 7,736.16 | 12,837.25 | 39,158.03 | 7,966.20 |
| Oil royalties: | 142,162.79 | 117,913.52 | 133,980.81 | 173,966.02 | 98,888.47 | 109,079.16 |
| Miscellaneous: | ——— | 25.00 | 365.75 | 34.70 | ——— | ——— |
| Total income: | $159,978.29 | $133,144.31 | $147,850.07 | $208,101.94 | $150,260.38 | $122,798.63 |

Subsequent to January 29, 1940, the time of the so-called rejuvenation of the trust, the District Court of Matagorda County has on three different occasions, 1943, 1949 and 1951, appointed successor trustees nominated by the beneficiaries to fill vacancies occurring. Subsequent to the decision of the Board of Tax Appeals in 1932 and at least during the years in question here, the trustees have used a seal on their tax returns. They have also used a letterhead with the name "Northern Ranch" and with the names of the trustees listed in the order of their seniority.

In a claim for refund made in 1948, under Section 735 of the Internal Revenue Code, 26 U.S.C.A., the trustees state that:

"Taxpayer is an active 'business trust' taxed as a corporation."

In a brief accompanying that claim, the trustees outlined a history of oil leasing of the trust property dating from 1924 and state:

" * * * On November 25, 1938, a producing well was drilled on the trust property."

"After November 25, 1938, the trustees were in the oil business."

During the tax years in question, the trustees executed a total of nine oil leases. Leases were executed in all of the tax years with the exception of 1950.

*Income strictly from royalties and bonuses* during the tax years was:

| Year | Royalties & Bonuses | Total Income |
|------|--------------------|--------------| 
| 1945 | $148,502.07 | $159,978.29 |
| 1946 | 119,533.77 | 133,144.31 |
| 1947 | 136,266.72 | 147,850.07 |
| 1948 | 175,903.02 | 208,101.94 |
| 1949 | 128,986.37 | 150,260.38 |
| 1950 | 109,079.16 | 122,798.63 |

During the years in question, the beneficiaries paid to the trustees for their services a total of from $6,000 to $12,000 per year, indicating compensation for services of a type more specialized than would be expected to be the case for those charged only with the duty of receipt and distribution of trust income. The trust paid legal fees and expenses including a $1,950 unitization expense in 1950, and in 1948 and subsequent years paid an advisory board fees ranging from $150 to $400 per year.

The issue presented is whether during the tax years in question, 1945 through 1950, the trust was solely a liquidating trust or was operating as an association taxable as a corporation within the meaning of Section 3797(a) (3) of the Internal Revenue Code, 26 U.S.C.A. § 3797(a) (3).

The distinction between maintaining and operating trust property until it can be liquidated without sacrifice or injury and operating as an association for business or enterprise purposes is one that has bothered the courts for many years.

In Nee v. Main Street Bank, 8 Cir., 1949, 174 F.2d 425, 428, one of the cases relied upon by the defendants herein, the Court of Appeals for this Circuit stated:

"To permit a trust to be classified as an association for income tax purposes, it must (1) be initially created, *or have been thereafter utilized* during the tax period involved, as a vehicle for carrying on a business enterprise, and it must (2) have characteristics, under its written structure or in its adopted mode of operation, resemblant of a corporate organization. Morrissey v. Commissioner, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263. Both of these features are requisites in making the income of a trust taxable as that of an association. The first, however, is the substantive element, and the second is simply one of supportive but not invariable form. Helvering v. Washburn, 8 Cir., 99 F.2d 478, 481.

"On the first feature, a trust cannot ordinarily be regarded as having been created for an enterprise purpose, or as having thereafter become converted into an enterprise, if its sole or dominant object and activity are a liquidation of the trust estate or a holding to preserve the trust property. Fidelity-Bankers Trust Co. v. Helvering, 72 App. D.C. 1, 113 F.2d 14, 19, and cases cited. 'That transactions of a business character are necessary incidentally to (a liquidation or preservation of particular property placed in trust for that purpose) does not, without more, convert a trust having such primary objectives into a "business enterprise".' 'The ultimate question is whether the trust performs some nonbusiness function of this sort or operates a business enterprise as a going concern.' Id., 113 F.2d at page 18." (Emphasis supplied.)

The Government relies upon such case, claiming that the facts therein were "quite similar" to those in the cases at bar. The facts were very similar, although not identical. In the Main Street Bank case, there was a rejuvenation of the trust, followed immediately by the executing of oil and gas leases and drilling operations on the trust property. The trustees themselves, however, were given no power to sell or liquidate the property. The trial court held that it was dealing with a liquidating trust only and gave judgment for the trustees. Upon ap-

peal, the case was reversed on the ground that the reviewing court, on the entire evidence, was left with "the definite and firm conviction that a mistake had been committed."

An earlier Eighth Circuit holding, United States v. Rayburn, 1937, 91 F. 2d 162, 163, 165, is to much the same effect as the Main Street Bank case. In the Rayburn case, an Iowa corporation held land in Texas. An earlier irrigation project had proved unsuccessful. In 1927, after oil companies had become interested in the land and after the corporation had executed several oil leases to these oil companies, the corporation was dissolved, its property was distributed to the stockholders, and the stockholders created a trust, with power " 'to sell and convey and convert the same into money and distribute the net proceeds thereof * * *.' " During the tax years of 1929 and 1930, the activities of the Rayburn trust were making oil and gas leases, collecting bonuses and rentals thereon, and distributing the net proceeds to the beneficiaries. The trial court concluded that the trust was not engaged in a business enterprise during 1929 and 1930, and that it was therefore not taxable as an association during those years. The Court of Appeals reversed, holding that the trust was taxable as an association. In so holding, the Court said, at 91 F.2d 168:

> "If we consider this [trust] instrument in the setting of the other evidence, as the trial court properly did, it becomes clear that this was not a mere liquidation or a mere holding trust. * * * When we consider that this trust was created in immediate connection with the oil leasing of these lands for a long term of years and that it expressly empowered the trustees to lease the lands and to collect 'all rents and income from the property,' it is evident that the creators of the trust intended to carry on the same business enterprise respecting the same property as they had been doing under the former company and that

> they successfully formed the trust to that end."

In Nee v. Linwood Securities Co., 8 Cir., 1949, 174 F.2d 434, 437, decided by the Court of Appeals for this Circuit at the same time it had before it the Main Street Bank case, the Court sustained the finding of the trial court that the trust there was a pure trust for liquidating purposes only and not an association for business enterprise under facts which also bear resemblance to those with which we are here concerned. The Court held, in the Linwood Securities Co. case, that the evidence did not leave them " 'with the definite and firm conviction that a mistake had been committed' ", but in so holding, stated, 174 F.2d at page 437:

> "That the trial court could have viewed the facts differently, or that we might perhaps have done so, if we had been the initial trier thereof, does not alone entitle us to reverse. Under Rule 52(a) and its interpretation in the United States Gypsum Co. case [U. S. v. U. S. Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746], there must exist a stronger basis for overthrowing a finding of fact than a mere difference in personal judgment. Such evidentiary weight and such convictional certainty must be present that the appellate court does not feel able to escape the view that the trial court has failed to make a sound survey of or to accord the proper effect to all of the cogent facts, giving due regard, of course, to the trial court's appraisal of witness credibility where that factor is involved. Here a closer margin for the exercise of our review function exists on the record before us than on that in the Main Street Bank case, on the basis of the difference in the time and the events in relation to which the trust was created, in the immediately preceding status of the property, in the seeming opportunity for exploitation which was involved, in the apparent pur-

pose for which the powers were directly granted, and in the circumstances of the situation generally."

In sustaining the trial court's finding in behalf of the taxpayers, the Court stated, 174 F.2d at page 435:

"It will be noted that, unlike the Main Street Bank case, the trust here was not reconstituted at a time of or in relation to some proceeding or culminating oil development. The situation at the time seems to have been, as it also continued to remain for a period of eight years following the making of the trust, a simply passive one, and on the record before us the trial court could properly find that there had not been any expectation or belief by the beneficiaries of some change, in relation to which they had acted in 1928, when the trust was constituted, and which they were designing to exploit. The two oil leases which the trustees executed, during an interval of six years, were, as we have stated, in conventional form. They involved no bonus payments, or agreements to pay more than the ordinary royalty share, such as did the leases which were in existence in the Main Street Bank case at the time that trust was constituted, and no other intensifying or evaluative incidents appear to have existed, such as those which prompted the creation of the Main Street Bank trust.

" * * * In the Main Street Bank case, we felt that the conclusion was not reasonably escapable that that trust had been set up for entrepreneurial purposes, considering particularly the time of its creation, the developments then occurring on the property, the potentialities which had been recognized by the lessee in having entered into more than conventional leases, the apparent call upon the trustees to exercise bargaining astuteness in the making or renewing of any leases (as demonstrated by the terms of the previous leases), the powers granted to the trustees (and also that withheld, as previously permitted Mattern, of selling the property) read in the light of the whole situation, and the position of the trustees to do (and their having done, by granting a water lease and a release of other water rights to the lessee) acts intended to further as far as possible the immediate productive exploitation of the property."

It seems to this Court that the facts with which we here deal approach nearer the situation presented in the Main Street Bank and the Rayburn cases than in the Linwood Securities Co. case. It is true that the trustees in the instant case have the power to sell, unlike the trustees in the Main Street Bank case, but the trustees in the Rayburn case also had the power to liquidate. One of the most persuasive elements is that of timing, that is, the rejuvenation of the trust immediately following the bringing in of a producing well. Another is the granting to the successor trustees the power to borrow money and to hypothecate the trust properties. It may be granted, as pointed out by counsel for the plaintiffs, that the original trustees possessed implied powers to borrow money for the benefit of the trust, but the specific designation thereof in the powers granted to the successor trustees would indicate that it may have been contemplated that in the event it became necessary to exploit further the oil and gas rights the trustees could have borrowed money and even have drilled their own oil wells if lessees could not be found who would do so.

There are additional persuasive findings which lead this Court to the conclusion that the trustees, during the years in question, were an association engaged in business enterprise and should be taxed as a corporation, such as the very duration of the trust itself. It commenced in 1914. The last year with which we are here concerned was 1950 and the trust is still in existence and op-

erating. It is not at all improbable that had the old Northern Irrigation Company continued in existence up to the present time it would have conducted the affairs in no different manner than that in which the trustees and their successors have conducted such affairs. When the raising of rice became unprofitable, they turned to other business endeavors. When ranch operations and the raising of cattle directly by themselves became not too profitable, they leased the property to another. When that did not bring in great returns, they sold the surface rights but maintained to themselves the oil, gas and mineral rights and proceeded to exploit their possibilities with astuteness and business acumen.

True enough, there is evidence that the trustees made efforts to sell not only the surface rights but the mineral rights as well. Such efforts in themselves and alone are not determinative. Instead, it would appear to this Court that following the bringing in of the first producing well the trustees were in the oil business and their handling of their oil rights was in no way different or contrary to what might have been expected of the Northern Irrigation Company, had it continued to exist.

Whatever may have been the original or avowed purpose of the trust, the facts clearly lead to the conclusion that this trust was rejuvenated and utilized, during the tax years in question, for carrying on a business enterprise. Whether the new provisions were added only for clarity or otherwise, it is plain that the District Court proceeding in 1939 and 1940 gave new vitality to the trust, secured to it that certainty of legal status which oil companies interested in its properties would desire, and made the trust a convenient and useful device to exploit the then apparent oil potential of its properties. Activities of the trustees, during the tax years involved, have been directed not only to receiving royalties from existing developed leases but also to leasing and releasing of its undeveloped property.

The supportive characteristics of resemblance to corporate form are present: The trustees, like the corporate entity, hold title to the property and are a continuous body with provision for succession; the trustees here nominated by the beneficiaries, furnish centralized management, like corporate directors designated by stockholders; the beneficial interests in this trust are represented by certificates which permit transfer, both inter vivos and at the death of a beneficiary, without affecting the continuity of the trust, just as shares of stock in a corporation facilitate the continuity of the corporate enterprise; and it does not appear that the beneficiaries are personally liable here, just as shareholders of a corporation are generally not personally liable.

The conclusion is that the plaintiff trustees were an association taxable as a corporation from 1945 through 1950.