**Tom ANDERSON, Gilbert L. Elken, Jr., and Norman E. Biorn, Trustees, Appellants,**

**v.**

**James S. LAMB, United States Collector of Internal Revenue for the District of North Dakota, Appellee.**

**Tom ANDERSON, Gilbert L. Elken, Jr., and Norman E. Biorn, Trustees, Appellants,**

**v.**

**UNITED STATES of America, Appellee.**

**Nos. 15147, 15148.**

United States Court of Appeals
Eighth Circuit.

May 12, 1955.

---

———◆———

Richard A. Moore, St. Paul, Minn. (Norman E. Biorn and Faricy, Moore & Costello, St. Paul, Minn., with him on the brief), for appellants.

Louise Foster, Sp. Asst. to the Atty. Gen. (H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack and Robert N. Anderson, Sp. Assts. to the Atty. Gen., and Robert Vogel, U. S. Atty., Fargo, N. D., with her on the brief), for appellees.

Before GARDNER, Chief Judge, and JOHNSEN and COLLET, Circuit Judges.

JOHNSEN, Circuit Judge.

The trustees of an alleged liquidating trust, created in 1914, were held by the Board of Tax Appeals, Carlson v. Commissioner of Internal Revenue, 27 B.T.A. 93, as to the year 1925, to have been operating the trust as an association, and so to have given rise to liability on the part of the trust for income taxes in that year as a corporation. From that time on, the trustees filed returns and paid income taxes for the trust as a corporation, down to and including the year 1950. Later, they sued to obtain refunds, for the years 1945 to 1950 inclusive, of the difference between what they had thus paid and what the tax on such income would have been as that of a mere trust.[1] The District Court denied recovery, 120 F.Supp. 99, and they have appealed.

The question here is simply whether the court was clearly wrong in its appraisal and conclusion that, on the history of the situation and the things which were being done, such holding of the trust property as was involved for the period in controversy and such activities as were being conducted in relation thereto legally had the stature of more than mere incidents of attempted liquidation on the part of the trustees and together with their commercial nature and substantiality were demonstrative of entrepreneurial intent and result in respect to the beneficiaries. We think that the court could properly hold, as it did, that the trust had been functioning as an association rather than as a mere trust in the particular circumstances.

It is not necessary to repeat all of the facts detailed in the trial court's opinion, 120 F.Supp. 99. They show, among other things, that, while the trust originally had been created as a vehicle to liquidate the assets of a dissolved corporation and make distribution of the proceeds among its stockholders, with directions to the trustees to convert the property into cash as soon as this could reasonably be done without sacrifice or injury to the beneficiaries, the beneficiaries and the trustees had permitted the trust to have,

[1] Two suits are involved—one against the incumbent Collector for the taxes which had been paid to him, and one against the United States for the taxes which had been paid to his predecessor in office. The cases were consolidated for hearing in the trial court and have similarly been consolidated here.

up to the time of the trial, an economic existence of 40 years, and that, during this period, when a portion of the property which constituted its corpus had become the subject of oil leases, drilling and production, with exploitative demand arising generally as to other parts of the property, the beneficiaries had sought and obtained from the court, in the jurisdiction where the property was located, an order authorizing the trust to be continued for an additional span of 20 years beyond the date of the order and for such further period as the court might thereafter see fit to extend its life.

The assets initially turned over to the trustees had consisted of 17,000 acres of ranch and farm land, with its operating equipment, located in Matagorda County, Texas, on which the dissolved corporation had been growing rice and building an irrigation system. The trustees sold approximately 3500 acres of this body of land during the first few years of the trust but thereafter retained the rest and continued to operate it directly, as the dissolved corporation had done, until 1936—a period of 22 years—except that, with the approval of the beneficiaries, they expanded their activities and went into the cattle-raising business, in addition to growing rice, cotton and other crops, as well as making enlargement of the irrigation system. To carry on these operations, they employed a ranch foreman and all the other help necessary for the conduct of such an enterprise.

Commencing in 1929, however, the opportunity began to arise for them to make oil leases, and such leases were entered into with different parties as to various portions of the land. As this oil and gas interest in the property continued to increase, the trustees ceased their direct operation of the ranch and leased the surface rights thereof to their previous foreman, commencing in 1936. By 1938, a producing oil well had been brought in on a part of the property by one of the lessees, and interest in the mineral potentiality of the remaining land, of course, became further intensified. The interest in and potentiality of the property were such that the trustees were in a position to demand bonus leases from prospective lessees. To assist them in so handling the situation, the trustees employed two agents, on a commission basis, to negotiate oil and gas leases for the trust. They also at one stage of the oil activity engaged the services of an engineer to provide them with proper advice, in relation to the interest of the beneficiaries, on the matter of their entering into an agreement for the unitization of some of the trust's oil-producing property with adjoining oil-producing properties.

More than 20 producing oil and gas wells were shown to have been brought in on the trust property at the time of the trial, with other holes being the subject of previous and prospective drilling. In the immediate tax period that is involved, the trustees' operations had covered the negotiation and consummation of 9 substantial bonus leases. They collected during these years bonuses and rentals ranging from $6,850 to $39,150 annually and royalties running annually from $98,800 to $173,965 in amount. The total income of the trust for the various tax years ran from a low of approximately $123,000 to a high of $208,-000 per year.

In 1940, after two of the original trustees had died, the beneficiaries had nominated and petitioned the court to appoint successors and had had the order provide for the maintaining of a full corps of trustees, through the nominating of replacements by them and the submitting of such names to the court for approval. They further had had the order provide that authority should exist in the trustees "to borrow money for the benefit of the trust estate and, if required to do so, to secure the same by collateral on mortgage"—a provision which would appear to have been designed to make it possible for them to direct the trustees to engage directly in drilling on the property should the beneficiaries deem this desirable. And they also seemingly gave recognition to the fact that the trustees were in the situation which had develop-

ed being called upon and expected to render more than general fiduciary services, by having the order provide that they should have the right by majority vote to allow the trustees such compensation as they saw fit for the services that were being rendered. All of this, certainly, in its setting, was capable of being regarded by the trial court as throwing probative light on what it actually was that the trust set-up was engaged in doing, and just what the beneficiaries and the trustees were seeking to have accomplished thereby.

In arriving at its conclusion that the object and activity of the trust during the tax years involved had been, not the accomplishing of a liquidation, pursuant to the purpose for which the trust initially had been created, with the variable, allowable incidents which may reasonably attend such an undertaking, but an intended exploiting of the property itself, for the express purpose of obtaining economic gain beyond the field of liquidation, with a call upon the trustees to engage in the activity of lease-making as a business venture and to capitalize upon the opportunity which the situation presented for bonus-and-rental negotiation and bargaining, the court further could properly consider that the trustees had, almost from the very inception of the trust, and through a long period of years, engaged in entrepreneurial use of the trust property, and in that light realistically appraise whether this economic aspect was being intended to be abandoned, as the trustees claimed, or whether a shift was not simply being made in the form of that entrepreneurial use on the basis of the greater capitalizing opportunities which the developing oil situation had come to afford.

In this connection, the court relevantly noted that, while the trustees, despite their long period of previous holding, had suddenly taken occasion to get rid of all the surface rights in the land, after the oil potentialities and mineral-lease opportunities arose, they projectively saw fit to exercise the precaution of requiring the purchaser of the portion of the land on which the principal producing wells were located to give them a 40-year option to buy back this land in case a statute should be enacted "limiting the time that the minerals could be severed from the surface estate." 120 F.Supp. at page 103. Thus, manifestly, they were undertaking to safeguard the exploitative and economic possibilities of their major mineral-rights holding, so long as those resources had not been exhausted, in order to leave them in a position to continue the activity in which they were engaged.

As we have previously indicated, it is our view that the trial court was entitled to regard the trust as having been engaged in such entrepreneurial purpose and activity, during the tax years involved, as to warrant treating it as an association rather than as a mere trust carrying on liquidating function, and that this appraisal cannot convictionally be declared by us to be clearly erroneous. The court's conclusion also is in harmony with our decisions in Nee v. Main Street Bank, 8 Cir., 174 F.2d 425, and United States v. Rayburn, 8 Cir., 91 F.2d 162, although, of course, as in all such situations, the circumstances involved are not wholly identical.

But the court's conclusion in the situation and the application which it made of the principles of the Main Street Bank and Rayburn cases in arriving at that conclusion have a sufficiently sound basis in the focus which it drew upon the long history of entrepreneurial use which the trustees had been making of the trust property; the potentialities which the oil development and lease demand had afforded the trustees for shifting that entrepreneurial use to a field of greater capitalizing or exploitative gain; the opportunities which the particular situation presented for the activity of negotiating and bargaining for more than conventional lease rentals; the steps which the beneficiaries judicially took to assure the continued machinery for and to facilitate the carrying on of these activities by the trustees; the hiring by the trustees of agents to engage in the negotiation of leases in order to carry the

activity to its fullest possible scope; and the commercial substantiality and consequence of what was actually done.

The supportive characteristics of resemblance of the trust to a corporation, in its structure or functioning form, to entitle the trust to be taxed as an association, are so clearly present in the situation as to make unnecessary a repetition here of the details, which are set out in the trial court's opinion, 120 F.Supp. at page 107.

Affirmed.